VINCENT CHAMBERS, *et al.*, Appellants, *vs.* THE BOARD OF EDU-
CATION OF THE TOWN OF CAMERON, Respondent.

1. *Contract in writing for lumber for building school house—Delivery of lumber
to superintendent—Payment of instalments as work progresses—Subsequent
vesting of title—Parol agreement of School Board—Written contract, how far
may be varied by—Transfer of possession.*—Under a written contract with a
School Board, a builder agreed to furnish lumber for the erection of a school
house, payment to be in instalments as the work progressed; and bond was
given to secure his compliance with the contract. Afterward at a meeting of
the Board, from a conversation among the members, it appeared that there
was a verbal understanding that a certain sum should be advanced to the
builder for the purchase of lumber, which should thereupon become the prop-
erty of the Board. But no minute or record of such arrangement was pre-
served. The lumber was bought by the builder and placed on the school prem-
ises in charge of a superintendent appointed by the Board. For an unpaid
balance of the purchase money, the vendor, took a bill of sale of part of the lum-
ber on the premises, and brought replevin therefor. *Held*, that the general
agreement embraced in the written contract, that the lumber should be paid
for in instalments as the work progressed, and the fact that under the con-
tract the material was placed on the premises in charge of the superintendent,
especially when taken in connection with the giving of the bond, would not,
on the purchase and delivery of the property, vest the title of the same in the
Board. The written contract would not be held to show such intent. And
the oral agreement, by the terms of which the property was to so vest, being
inconsistent therewith, was inadmissible to affect the written contract.
As to whether the builder's title to the lumber could be transferred merely by
the parol agreement above referred to, so as to preclude his creditors with-
out any visible change of possession, *quære?*
2. *School Boards—Proceedings of, how proved.*—Proof of regulations, orders,
etc.,of School Boards, is not limited to the copies of those proceedings refer-
red to by the statute. (Wagn. Stat., 1872, p. 1267, § 13.)
3. *Contracts in writing—How far may be varied by subsequent parol agreement.*
—Written contracts may be altered by subsequent parol agreements in rela-
tion to the time of performance on matters about which the contract makes
no provision.

*Appeal from Clinton Circuit Court.*

*Wm. Henry* and *J. E Merryman*, for Appellants.

The contract was let to Ely, and by its terms he undertook
to furnish all the materials and complete the building in a
specified time and manner, and for a stipulated compensation.
Hence, he was not an agent or servant of the Board. (Blake

Chambers, et al. v. Board of Education of the Town of Cameron.

vs. Ferris, 5 N. Y., 48, 61, and cases cited; Pack vs. Mayor, &c., of New York, 8 N. Y., 222; Eaton vs. En. & North. R. R. Co., 59 Me., 520; Painter vs. The Mayor, &c., of Pittsburgh, 46 Penn. St., 212.)

And the rule is the same, although the contract should provide that the work was to be done under the direction and to the satisfaction of certain officers of the corporation. (Kelley v. Mayor, &c. of New York, 11 N. Y., 432; Barry vs. City of St. Louis, 17 Mo., 121.)

From the fact that Ely was not agent or servant of the Board, it follows that he might build and complete the school house by any agency, and with whatever means or material he saw fit, subject, however, to a suit for damages in case of a failure to fulfill his contract. And he might have placed upon or removed from the premises whatever material he pleased, and the title thereto would not *ipso facto* vest in the Board before it was worked into the building, or so attached to the premises as to become a part of the realty. (Hill Rem. Torts, p. 25; Johnson vs. Hunt, 11 Wend. 137.) And under this view of the law the appellants are the owners of the property; and the case is not changed by the private verbal understanding that Ely was to have $3000 advanced to him to buy lumber for the building, and that the lumber was to belong to the Board, because: 1. Such an understanding would be fraudulent in fact and in law, both as to creditors and subsequent purchasers. 2. Defendant could only prove its acts by its record or by a sworn copy, or a certificate by the president and secretary, and authenticated by the seal of the Board. (Wagn. Stat., 1267, § 13.) 3. No contemporaneous verbal agreement can be allowed to contradict, vary or extend a written contract. 4. If the agreement amounted to a mortgage or pledge of the lumber, it was void, because the agreement was verbal, and the pledge or mortgaged property was never delivered to the pledgee or mortgagee.

*Thomas E. Turney*, with *S. H. Corn*, for Respondent.

I. The first instruction given at the request of defendant was properly given.

The Board of Education by reason of the inspection of the superintendent employed by the Board and the payment of his estimates to Ely, had either the absolute property in the lumber, or such an interest in it as would prevent Ely from using or dealing with it for any other purpose than the erection of the school building. (Sto. Sales, 2 ed., §§ 233-4, and 315-16; Woods vs. Russell, 5 Barn. & Ald, 942; Laidler vs. Burlinson, 2 Mees. &. W., 514-17; Clark vs. Spence, 4 Ad. & E., 448; Willk. Ship., ch. 2; Atkinson vs. Bell, 8 Barn. &. Cres., 282; Carothers vs. Payne, 5 Burg. R., 277; Oldfield vs. Love, 9 Barn. & Cres., 73-78.)

Evidence of the parol agreement was properly admitted. It did not add to, enlarge or vary any written agreement between the parties.

II. This is not a case of an innocent purchaser for value from one in possession. The defendant was in possession and plaintiff had notice of all the facts which gave title and possession to defendant.

Napton, Judge, delivered the opinion of the court.

This was an action to recover possession of some lumber alleged to belong to the plaintiffs.

The plaintiffs were lumber dealers in Muscatine, Iowa, and sold to one Ely a lot of lumber for $3,600, for which Ely paid in cash $1,500 and was charged with the remaining $2,100. Ely was a carpenter and builder, and purchased the lumber to be used in building a school house at Cameron, for the construction of which he was the contractor, under a written contract with the defendant, the Board of Education. The lumber was forwarded to Ely, and by him hauled from the R. R. depot and placed on a lot belonging to the School Board, where the school house was to be built. It does not appear how much of the lumber was used in the building, from the month of May, when the contract was made and the building commenced, until the month of December, 1872, when the controversy upon which this action is based arose.

It appears, however, that on the 28th of December, 1872, Ely was still indebted to the plaintiffs, on account of this lumber, in the sum of $1,575, and one of the firm, having come down to Cameron to secure the debt, took a bill of sale from Ely for a portion of this lumber sufficient to cover the sum owing on it, had it marked or branded with the firm name, and was about to remove it, when the defendant claimed the ownership, and prevented its removal. This action was then brought by the plaintiffs.

There is very little, if any, discrepancy in the testimony, except upon one point, which relates to a verbal contract between two of the board of trustees and Ely.

There was a written contract between the Board of Trustees and Ely for the building of the school house, which was to cost about $21,000. This contract is in the record. By this contract, which was dated May, 4, 1872, Ely was to build the school house and appurtenances described in it, and furnish all the materials and perform all the work according to certain plans referred to in the contract and under the supervision of an architect named. The house was to be completed on the 1st of November, 1872. Charges were to be allowed by the architect, etc. The board was to pay Ely $20,789 in instalments as the work progressed, reserving ten per cent., etc., from the amount of the work done and materials delivered on the ground or in the building. These instalments were to be paid on certificate of the architect, etc. It was further provided, that for the materials used or to be used in said building, upon Ely's filing his bond for $20,000, said bond being approved by the Board, the sums required for said materials should be paid upon the written order of the architect, and when approved by order of the Board, should be paid to Ely.

This contract was duly executed, signed by the president of the Board and Ely; and on the same day Ely executed his bond for $20,000, as required by this contract. So far the facts were undisputed.

On the part of the defendant Th. E. Turney testified as follows : " I have been a member of the Board since its organization, and treasurer of the Board ; was present at the meeting of the Board at which Mr. Ely made application for an advance of money to buy lumber. It was the meeting at which his contract to erect the building was signed and bond filed. He requested the Board to advance him $3,000. saying that he could buy lumber much cheaper if he could pay cash. The Board agreed to let him have $3,000, upon an agreement that he should purchase lumber with it, and that the lumber purchased should be the property of the Board. The Board then directed me, as treasurer, to advance the $3,-000 to Ely. I gave him a check on New York, etc."

This statement is denied by Ely ; but as the finding was for the defendant, it may be assumed to be correct.

It further appears beyond dispute, that the lumber bought by Ely was put on the lot owned by defendant, where the building was to be erected, and was used by Ely as needed in the building.

In October, 1872, one of the plaintiffs came to Cameron to get the balance due the firm from Ely. He was informed by the treasurer of the verbal agreement which has been stated, and that Ely had been paid upon the estimates certified by the architect. At the suggestion of this member of the firm, a re-examination was made, and a mistake of $366 was discovered in favor of Ely, and the amount was paid to plaintiffs.

There is no dispute that the lumber when sent down from Iowa was put on the school lot where the building was to be erected, and remained there until this suit was brought. Upon this state of facts, the court declared the law to be as follows : ·

1. That from the evidence it appears that the lumber in question was purchased by A. J. Ely for the purpose of erecting a public school building for defendant, in the town of Cameron, and was placed by him on the ground of defendant, and was inspected and received by a superintendent em-

ployed by defendant, and estimates were made by said superintendent in said Ely's favor, which included said lumber and the freight thereon, and that said estimates were paid by defendants to said Ely, and that plaintiffs had notice of these facts before they purchased the lumber of said Ely ; therefore the finding and judgment must be for defendants.

2. If it appears from the evidence, that at the special instance and request of plaintiffs, defendant's superintendent made a second estimate of said lumber, and that by said second estimate it was found that there was still due and unpaid a certain sum of money in addition to the amount found due upon the first estimate, and that the amount found due and unpaid was paid by defendant to plaintiffs, and at their request, the finding and judgment of the court must then be for the defendant.

3. If it appears that subsequent to the signing of the written contract the defendant furnished Ely $3,000, with which to purchase lumber, before he was entitled to any money under said contract, and in consideration thereof said Ely agreed that all lumber purchased by him should be the property of defendant when delivered on defendant's ground, and that plaintiffs had notice of these facts before they purchased said lumber of said Ely, the finding and judgment of the court must be for defendant.

4. If it appears that the purchase of the lumber by plaintiffs of Ely, was conditioned upon the recovery of the debt against him from the defendant, and that plaintiffs did not give said Ely credit for the amount of said debt, the finding and judgment must be for defendant.

And upon these declarations of law, the court, to whom the case was referred without a jury, found for defendant.

Several instructions were asked by the plaintiffs, all of which were refused. These instructions, in substance, asserted that Ely was not an agent of the defendant, and therefore that the lumber bought by him, as contractor, was his property, and the sale to the plaintiffs conveyed the property.

The law in regard to the rights of property in the manufacturer or builder of a chattel and the person who employs him, who is termed the orderer, is thus stated, in Story on Sales and in other treatises, which have adopted or followed the leading English authorities.

" Where the contract is executory for the sale of articles not in existence, but to be made or manufactured, no property passes to the orderer, until the thing is completely finished, and is either delivered to him, or is appropriated to his benefit, set apart for him, and is accepted by him. Nor does it make any difference that the price is advanced, or that the contract contains a specification of the dimensions and other particulars of the thing to be made, and fixes the precise mode and time of payment by months and days ; since the agreement is considered as a bargain for an entire thing, and not for unfinished parts of it. So also, in such case, the maker would not ordinarily be bound to deliver to the purchaser the particular thing upon which he is engaged and intends for such purchaser, or which the purchaser supposes to be intended for him ; but he may, if he pleases, dispose of it to some other person, and furnish another article corresponding to the specification or the contract. But where the contract provides that the article shall be built under the superintendence of a person appointed by the orderer, the manufacturer could not compel the orderer to accept a thing not constructed under the direction and approved of by the superintendent ; and therefore he could not sell to any other person than the orderer an article, the building of which had been so superintended, since, if he could, he would thereby be enabled to burden the orderer with the expense of employing a person again to superintend the building of another vessel. The fact, therefore, that a superintendent is appointed, is considered as an appropriation of the materials approved by him and used in the construction of the thing, and an appropriation of the thing so far as it is constructed." (Sto. Sales, § 233.)

The last paragraph in this section is based on the authority of Woods vs. Russell, (5 Barn. & Ald. 942) and Clark vs. Spence, (4 Ad. & Ell., 448). The rule was applied to ship-builders, and was originally advanced in the case of Woods vs. Russell, and was followed in the case of Clark vs. Spence, chiefly on the ground that ship-builders and orderers (as they are termed) might have acted on the faith of the first decision ; and the English courts, on conservative grounds, therefore followed the first decision, though with considerable doubt as to its propriety.

In New York and in Massachusetts the principle announced in Woods vs. Russell, that the appointment of a superintendent, and the agreement to advance money to the manufacturer as the building progressed, would thereby, (contrary to the general rule of law) invest the property in the orderer, is repudiated. (Andrews vs. Durant, 1 Kern., 35 ; Williams vs. Jackman, 16 Gray, 514 ; Briggs vs. "A Light Boat," 7 Allen, 287.) In these cases it was held that the general rule of law was well settled, that under a contract for building a ship or making any other chattel, not in existence at the time of the contract, no property vests in the purchaser during the progress of the work, nor until the ship or other chattel is finished and delivered. At the same time it was conceded that there were exceptions to this rule, growing out of express stipulations in the contract between the orderer and the builder, by which the building, as it progressed, might vest in the purchaser from time to time. But they denied that an agreement to pay the purchase money in instalments, as the work progressed, or a stipulation for the employment of a superintendent by the purchaser or orderer would operate to change the general rule of law, and vest the title in the orderer to so much of the chattel as was built.

The question, as these American courts declare, depends on the intent, to be inferred from an interpretation of the contract. If the intent of the parties to the contract is to invest the property in the purchaser during the progress of the work and before its completion, the courts will give effect

to such intent, and the property be held to pass; but the general rule of law will prevail unless such intent is clearly manifested.

These principles relate to chattels, and have been chiefly applied in cases of ship building; but are equally applicable to builders of houses, so far as the materials for the building are concerned, with the exception that when the materials are once put in the building and thereby become a fixture, the owner of the land, who employs the contractor, of course owns the building on it, or so much of it as is completed.

Adopting then the modification of the English rule, as laid down in Woods v. Russell, made by the courts in New York and Massachusetts, in accordance with well settled principles, and conceding that a special contract may change the general rule of law, and transfer to the orderer property in the materials to be put into the building by the contractor, it is evident that in the case now before the court, the main question decisive of the merits of the case is, whether, under the contract between the contractor and the School Board, the lumber in question was transferred to the Board, so soon as bought by Ely and placed on the lot where the school house was to be built.

The testimony in this case, on this point, has been copied. If the contract executed by the Board and Ely had embraced such a provision as is proved by the testimony of one of the members, the case would be clear. But the written contract in evidence made no such provision. On the contrary, the contractor, Ely, was to furnish materials, and the board might advance to him money to buy them, on the certificate of the architect. To secure the board against misappropriation or other failure of the contractor, a bond in $20,000 was required of the contractor. The contract was duly signed according to law, and the bond was accepted according to law.

At the same meeting of the Board at which the contract was executed, it appears that Ely applied for an advance of $3,000, to enable him to buy lumber. This advance was made, but upon the condition that the lumber so bought

should be the property of the Board. This is stated by a member of the Board. No minute of such contract was entered; no record shows its existence. The written contract, made on that day, contains no such stipulation.

The 13th section of the Act, concerning schools, Art. 2 provides that, "all regulations, orders, resolutions and other acts of said Board may be proven in all courts and places, either by a sworn copy thereof, or a copy certified by the president and secretary, and authenticated by the seal of the Board."

But there are, no doubt, other modes of proving the action of the Board. In this case their action is established by a written contract. The question is whether a parol contract made by one or two of the members could alter the written contract, on the same day it was executed, or whether the whole Board could do so, without a record of such resolution.

There is no doubt that written contracts may be altered by subsequent parol agreements, in relation to the time of performance or in regard to matters about which the written contract makes no provision. But in this case the written contract makes ample provision for advancement of money to Ely for materials; and, for security for such advances, requires his bond for $20,000. The parol contract requires an additional security of a transfer of the materials to defendant. The two contracts were inconsistent. They were made on the same day and cannot be reconciled. By the written contract any amount might have been advanced by the Board, for materials, if the architect so certified. The amount of $3,000 was advanced by the Board to enable the contractor to buy lumber, on the condition that the lumber bought and delivered should belong to the Board. This would make the contractor a mere agent or servant of the Board, so far as materials to the value of $3,000 are concerned, and would give to the Board the property in such materials, so soon as they were delivered on the lot where the house was to be erected. By the written contract, the contractor was bound to furnish materials, and such materials were

of course his property until put into the building, and any loss or destruction of them by fire or otherwise, would be his loss. But by this parol agreement, said to have been made contemporaneously with the written agreement, the materials belonged to the defendant as soon as they were delivered to the contractor, and if lost by fire or other accident, the loss would have fallen on the defendant. There is then a great discrepancy between the written and the oral contract; the latter varying from the former in essential particulars, relating to the same subject matter. The oral contract is evidently inferred from loose conversation between two members of the Board (composed of six persons) and the contractor, and was really differently understood by the parties to it. The written contract was a carefully prepared instrument in writing, adopted formally and regularly by the Board, and signed by both parties, and was executed in the manner which the law authorized.

It might be questioned if the School Board had any authority, under the law, to invest $3,000 in lumber, and risk the chances of its being used in a building which they had authority to have built. But, conceding that they had the power to do this, the contract should have been in the form, and authenticated in the mode, required by the general and special law. The loose conversation between members of the Board and the contractor, after a formal execution of a written contract between the Board and the contractor, cannot be allowed to vary the written contract. It would be unsafe to both parties to allow such parol variations; and the well settled rules of law do not permit such proofs. The third instruction, therefore, given by the court for the defendant, was erroneous, and this instruction was upon a point on which the merits of the case mainly depend.

The first instruction seems to be based on the law applicable to chattels, as declared in the case of Woods vs. Russell, and followed by the compilers of elementary treatises in this country. It, however, goes a step beyond, in assuming that the materials on the ground, designed to go into the building

but not in fact so used, became the property of the owner of the lot, or the orderer (as he is termed in some of the books) the moment they were placed on the ground by the contractor, although by the terms of the contract the builder was to furnish the materials, and there was no special contract (as assumed in the 3rd instruction) to transfer the property to the orderer. And this doctrine was based on the ground that a superintendent was appointed by the orderer, and that the manufacturer or builder was to be paid in instalments, as the work progressed, and that in such cases, where the materials were inspected and allowed by the superintendent, the title to them at once passed to the purchaser or orderer. But the general law is otherwise, as the cases in New York and Massachusetts, and indeed in England—unless we except the case of Woods vs. Russell—show ; and there must be a special agreement between the contractor and his employer, to transfer the property so bought by the contractor to his employer ; and in this case there was no such agreement, except the parol one heretofore considered. Or this instruction may have been based on the assumption, that when the builder put the lumber on the ground of defendant, with the intention to use it in the building he was to erect on such ground, this alone transferred the title in the materials to the owner of the ground. But this is not the law. The materials belonged to the builder, and were at his risk until actually put in the house. The fact that the builder bought them with a view to put them in the defendant's house, did not change their ownership, nor did the inspection of the superintendent or architect have this effect. (Johnson vs. Hunt, 11 Wend., 187 ; Mucklow vs. Mangles, 1 Taunt., 319 ; Merrill vs. Johnson, 7 Johns. 473.)

The lumber bought of the plaintiffs in this case, it seems, cost $600 more than the money advanced by the defendant. It does not appear whether all the lumber was needed for the school building or not. By the terms of the contract, the building was to have been completed in November, 1872, and it was on the 28th of December, 1872, that the plaintiffs, or

one of them, procured the transfer of lumber to the value of $1,750, then still on the lot where the building was to have been erected. When the house was finished does not appear.

The second instruction given by the court was based on a supposed estoppel, produced by the act of one of the plaintiffs, in receiving some $300 from the treasurer, in October, which was, on a re-examination of the accounts between Ely and the Board, found to be due to Ely. We are unable to see any ground for such an application of the doctrine of estoppel. The plaintiffs were creditors of Ely, and not unwilling to collect the debt, or so much of it as could be obtained from Ely or from the defendant who employed him. Their reception of $300 dollars from the treasurer, which upon re-examination of Ely's account was found to be due him, was no admission in regard to the property now in dispute; in fact, had no connexion whatever with it. The same observation will apply to the fourth instruction, which directs a verdict for defendant, because the plaintiffs never entered a credit on Ely's account, when they took the bill of sale he gave them for the lumber; in other words, because they did not know whether their title under this sale would be valid or not.

They filed a mechanic's lien on the building, which was also a matter of law about the efficacy of which they might be mistaken.

The merits of the case, it is obvious, depend on the propriety of the 3d instruction, which has been already examined and passed on. It may be added to what has been said on this instruction, that under our statute concerning fraudulent conveyances (Wagn. Stat., 281, § 10) a doubt might be entertained in regard to the power of Ely to transfer the title of this lumber to the Board, so as to preclude his creditors, by the verbal agreement testified to, without any visible change in the possession, unless Ely is to be regarded, so far as this transaction is concerned, as a mere agent or servant of the board.

It is clear from the contract formally entered into between the board and himself, that he occupied no such position, but

was a contractor to build the school house, and not a mere agent of the Board. When he bought the lumber now in question and other lumber used by him in the building, he bought it on his own account, and not as a servant or agent of the Board, and he was so treated by the plaintiffs. That he borrowed a portion of the money paid to plaintiffs from the Board, or from any one else, could not affect the rights of the plaintiffs. He was the owner of the lumber, when delivered to him. Although the delivery was upon the ground owned by the defendant, his title to the materials was not changed, unless the verbal contract referred to, conceding it to have been valid, could have the effect of transferring the possession.

The judgment must be reversed and the cause remanded ; the other judges concur.