Joyce EMERSON, Plaintiff-Respondent,

v.

Earl W. TREADWAY and C. E. Treadway d/b/a Treadway Brothers, Defendants-Appellants.

Joyce EMERSON, Plaintiff-Appellant,

v.

Earl W. TREADWAY and C. E. Treadway d/b/a Treadway Brothers, Defendants-Respondents.

Nos. 7150, 7151.

Springfield Court of Appeals.

Missouri.

Aug. 19, 1954.

616

Blanton & Blanton, Sikeston, for Joyce Emerson.

Limbaugh & Limbaugh, Cape Girardeau, for Earl W. Treadway and others.

STONE, Judge.

In this action for money and supplies furnished by plaintiff, as landlord, to defendants, as tenants, plaintiff recovered judgment for $8,867.33. However, defendants offered in their answer to allow judgment to be entered against them in the sum of $6,288.10; and, although this offer was not accepted, $5,405.03 has, pursuant to stipulation of the parties, been paid upon the judgment pending appeal, so the amount presently in controversy is substantially less than $7,500 and jurisdiction of the cross-appeals, which have been consolidated, is in this court. Article V, Sections 3 and 13, Const. of Missouri; Sec. 477.040. (All Missouri statutory references herein are to RSMo 1949, V.A.M.S.)

On January 10, 1951, plaintiff and defendants entered into a written "Farm Rental Contract For The Year 1951" (hereinafter referred to as the written contract), by which plaintiff rented to defendants certain lands in Scott County, Missouri. Defendant agreed in Article II(1) to pay as rental "one-fourth of 410 acres of cotton grown by the tenant upon the landlord's land," and in Article II(5) "to pay landlord 8% interest upon all monies and supplies, if any, furnished to the tenant by the landlord."

In his petition, plaintiff alleged "that he has advanced money, labor and supplies," upon which there was a balance of $9,605.-35. owing by defendants. Exhibit B to plaintiff's petition, which listed such "money, labor and supplies," contained items numbered 1 to 35, inclusive, of which items 1 to 9, inclusive, were charges for cotton seed and fertilizer, items 10, 11 and 12 were charges for spraying, items 13 to 28, inclusive, were charges for "expense of Mexican labor," item 29 was a charge for "pasture rent," and items 30 to 35, inclusive, were credits on account. (All subsequent references herein to numbered "items" are to the "items" in Exhibit B.)

Upon appeal, plaintiff complains about the judgment for defendants on items 13, 17 and 22; and, defendants complain about (a) "allowing recovery in full" to plaintiff on items 10, 11 and 12 (although defendants concede liability on those items for lesser amounts), (b) the judgment for plaintiff on items 14, 16, 18, 19, 20, 21, 23, 24, 25, 26, 27 and 28 and (c) disallowance to defendants of items 30 and 31 as credits on account. The payment of $5,405.03 to plaintiff pending appeal covered items 1 to 9, inclusive (and accrued interest thereon), for which defendants admitted liability in their answer. Plaintiff also concedes liability for item 15; and, although sharply contested upon trial, item 29 is no longer in controversy.

■■ This cause having been tried by the court, sitting as a jury, it is our duty to "review the case upon both the law and the evidence as in suits of an equitable nature." Section 510.310(4); Scott v. Kempland, Mo.Sup., 264 S.W.2d 349, 355(10); Howell v. Reynolds, Mo.Sup., 249 S.W.2d 381, 387(13). Although "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses" [Section 510.310(4)], we cannot avoid the responsibility of independent review and consideration [Cross v. Gimlin, Mo.Sup.; 256 S.W.2d 812(3); Faire v. Burke, Mo. Sup., 252 S.W.2d 289, 290(1)]. Similarly, although "(t)he judgment shall not be set aside unless clearly erroneous" [Section 510.310(4); Cosentino v. Heffelfinger, 360 Mo. 535, 229 S.W.2d 546, 549(1); Truck Leasing Corp. v. Esquire Laundry & Dry Cleaning Co., Mo.App., 252 S.W.2d 108, 109 (1)], we are enjoined by statute to "give such judgment as (the trial) court ought to have given, as to the appellate court shall seem agreeable to law" [Section 512.160(3); Allen v. Allen, Mo.Sup., 270 S.W.2d 33]. "Unless justice requires otherwise the court shall dispose finally of the case on appeal and no new trial shall be ordered as to issues in which no error appears." Section 512.160(3).

■ We consider first defendants' complaints about the judgment on items 10, 11 and 12 for three aerial sprayings of defendants' cotton. Plaintiff paid Cape Central Airways $1 per acre for each spraying; and, in testifying about the first and second sprayings, plaintiff said "I think 74¢ an acre is what the materials cost." Having due regard for the finding of the trial court against defendants on conflicting evidence offered on defendants' contention that plaintiff orally agreed to spray for $1.60 per acre, we believe that the judgment on items 10 and 11 should be on the basis of three-fourths of $1.74 per acre, it being agreed by the parties that plaintiff, as landlord, should bear one-fourth of the spraying expense.

Defendants testified that, when plaintiff talked with them about a third spraying, they told him that they had heard of nothing "safe to use" which would kill "red spider"; but, that plaintiff assured them that "the stuff was guaranteed, if it didn't do us no good, it didn't cost us nothing" and that

"in any event, it wouldn't cost over $2." Although plaintiff testified generally that he had charged defendants "the exact amount" paid by him for spraying, we note that he denied specifically that he had quoted a firm figure of $1.60 per acre for the *first* and *second* sprayings, but that there was no corresponding denial by him of defendants' assertion that, as to the *third* spraying, he had told them that "in any event, it wouldn't cost over $2." We think that the judgment on item 12 should be on the basis of three-fourths of $2 per acre.

Defendants complain of being charged for spraying 420 acres, rather than 410 acres. Plaintiff said that he had charged for 420 acres because "they told me they had 420." However, the written contract provided for payment of rental of "one-fourth of 410 acres of cotton"; and, plaintiff testified that "I figured they had 410 acres"— "That is what I contended." In our opinion, the record reflects no substantial basis for charging for more than 410 acres.

■ Defendants further contend that the court erred in allowing interest on items 10, 11 and 12 after November 9, 1951, when defendants presented to plaintiff an itemized statement which listed charges aggregating $6,941.82 (being items 1 to 12, inclusive, in this suit), reflected credits aggregating $720.74 (identical with items 32 to 35, inclusive), and showed a "total balance paid" of $6,221.08 which was then offered to, but refused by, plaintiff. Section 514.240, cited by defendants, provides that: "Where tender and no deposit shall be made, *as provided in section 514.230,* the tender shall only have the effect, in law, to prevent the running of interest or accumulation of damages from and after the time such tender was made." But, Section 514.230 deals with "(d)eposit or tender made *before suit,*" and these statutes have no application to the "tender" by defendants on November 7th *after* institution of this suit on October 22, 1951.

■ Wholly aside from the doubtful efficacy of any "tender" after suit which ignores the costs in the pending action and does not track the procedure provided by Section 514.250 for *"(t)ender in court after suit brought",* defendants' action on November 7th was, for another reason, ineffective to prevent the running of interest thereafter on items 10, 11 and 12. Plaintiff said that defendants' offer to pay $6,221.08 was "supposed to be payment in full"; and, although defendants did not so state specifically, we think it fairly inferable from their testimony that their "tender" was for the purpose of settling the entire account between the parties. If defendants sought to tender payment of the charges in items 1 to 12, inclusive, so as to stop the running of interest thereon, they were required to observe "that rule of the law of tender" thus stated in Johnson v. Garlichs, 63 Mo.App. 578, 583: "(T)he debtor has no right to attach as a condition to his tender anything, the acceptance of which by the creditor would force an abandonment of the creditor's position; in other words, would compel him to admit, as a consequence of his acceptance, that he had no further claim." And, even though this might be one of those cases in which "(t)he question is * * * extremely close as to whether the tender by a debtor of less than the amount claimed by his creditor is couched in such language or made under such circumstances that the creditor must have known the tender was on the condition that it be accepted in full payment" [Bahrenburg v. Conrad Schopp Fruit Co., 128 Mo.App. 526, 107 S.W. 440, 442(2, 3)], in which event acceptance would be "an accord and satisfaction, as a conclusion of law, the principle being that one who accepts a conditional tender assents to the condition" [Gulfport Wholesale Lumber Co. v. Boeckeler Lumber Co., Mo.App., 287 S.W. 799, 800(2)], we would not be inclined to hold that, under the circumstances of this case, defendants' "tender" of November 7th had the legal effect of preventing the subsequent running of interest on items 10, 11 and 12.

All other issues upon appeal pertain to "expense of Mexican labor." Plaintiff testified that, when the written contract was signed on January 10, 1951, "I told them (defendants) I was figuring on getting some

Mexicans for myself and if they was interested, we would sign up for them and figure on getting them when we needed them"; but, although plaintiff stated that "they (defendants) said they wanted them (Mexican laborers), would need them," plaintiff admitted that defendants did not *then* ask him to get Mexican labor for them. There was no evidence of any subsequent discussion concerning Mexican labor until "I (plaintiff) asked them (defendants) about the 10th of May if they needed the help, and they said they didn't, and I asked them about the 1st of (July) if they needed it, and they said they did, and we got the labor, I think it was the 7th of (July)." (The last two dates are corrected in accordance with plaintiff's testimony.) Ample local labor was available "at chopping time," and defendants chopped their cotton the first time with local labor. However, as a result of rain during June, the cotton "got pretty foul" with grass and weeds and "the hands were more scarce."

At some time not disclosed by the evidence (but prior to April 12, 1951), plaintiff and other farmers in Southeast Missouri formed a corporation known as Semo Harvesting Company (hereinafter referred to as Semo) to serve as "the agency through which the farmers operated in the procurement of the Mexican labor." Defendants were not stockholders of Semo, never attended any meeting of such stockholders, had no contacts or dealings with Semo, and neither executed nor had copies of any written work contracts with Mexican laborers. Semo "never looked to" defendants for any fees or expenses, and defendants made no payment to Semo.

"Before the crop was planted" and thus at a time when there admittedly was no shortage of local labor, plaintiff arranged through Semo for 50 Mexican choppers and 100 Mexican pickers. About July 10, 1951, plaintiff procured through Semo 50 Mexicans, 25 of whom "were turned over" to defendants and chopped cotton for them, while 25 chopped cotton for plaintiff on other tracts. These choppers worked about 30 days. About September 8 or 9, 1951, plaintiff procured through Semo 96 Mexicans, 46 of whom "were delivered to" defendants and picked cotton for them, while 50 picked cotton for plaintiff on other tracts. These pickers worked until November 7, 1951, when they were "checked out" and returned to Mexico. Each of the 96 Mexican pickers had an "Individual Work Contract" executed on behalf of Semo, as employer.

On April 12, 1951, plaintiff paid $450 to Semo, covering a charge by Semo of $3 each for 50 Mexican choppers and 100 Mexican pickers. Plaintiff here seeks to recover, on item 13, Semo's charge of $3 each for 25 choppers and *45* pickers used by defendants. Plaintiff agreed on cross-examination that this charge was for "the expense of forming that corporation (Semo), paying the attorney fees, paying the fee to the Secretary of State for incorporating, getting the minute book and the stock certificate book, and paying the secretarial help and charges of that nature." On redirect examination plaintiff said that this charge included "any expense connected with * * * Semo" and "office expense, telephone, office rent, if there was any, (and) transportation for Erb," a Semo employee, to the Mexican border to recruit labor. Irrespective of the theory on which plaintiff may have sought recovery for "expense of Mexican labor" (as to which we will have more to say later), we cannot find that the judgment for defendants on item 13 was "clearly erroneous" and accordingly the judgment on that item is affirmed.

In connection with procurement and use of the Mexicans obtained through Semo, plaintiff made various other payments (exclusive of wages which are not involved here) in an aggregate amount in excess of $6,100. These payments included an additional charge by Semo of $6.50 each "for recruiting, pictures * * *, insurance, food, etc." for the choppers, a charge of $5 each for hauling the choppers to Missouri, "recruiting expense" of $16.50 each for the pickers, a charge of $5 each for hauling the pickers to Missouri, charges for insurance on the laborers, the cost of bed ticks and blankets furnished to the pickers, a charge for "repatriation" of one picker, cash pay-

ments to the pickers when they were "checked out" (for "guaranteed work of first 48 hours at $5 per man," "subsistence * * * @ $1.00 per head for 10 days each, because of inclement weather in keeping with contract, laws and regulations," "retroactive pay * * * from September 28 to October 7 amounting to $4.50 per man when pay was raised by Mexican and United States government officials from $2.50 to $3.00 per cwt.," "cotton picking sacks refunded * * * at $3.50 per head," and "food expense for return trip * * * at $1.50 per head"), and a charge of $4.50 each for hauling the pickers on the return trip. In items 14 to 28, inclusive, plaintiff seeks to recover from defendants the pro rata part of the aforesaid payments allocable on a per capita basis to the 25 choppers and 46 pickers who worked for defendants. The trial court entered judgment for defendants on item 17 for $759 (the "recruiting expense" of $16.50 each for the 46 Mexican pickers used by defendants), and on item 22 for $57.96 (a charge of $1.26 each for "insurance for month of October, 1951," for the 46 Mexican pickers). On the other items of "expense of Mexican labor," judgment was entered for plaintiff in the aggregate principal amount of $2,074.68. Defendants conceded liability for $125 on item 15 (the charge of $5 each for hauling 25 Mexican choppers to Missouri), by virtue of an oral agreement with plaintiff shortly prior to July 10, 1951, in which defendants promised (as they said) to pay this item of expense but nothing else.

The record reflects a sharp and irreconcilable conflict in the testimony of plaintiff and of defendants. On the one hand, plaintiff asserted that defendants had asked him to get Mexican labor for them; that, although he did not remember the dates, he and defendants had talked about Mexican labor "a dozen times, more or less"; that "I told them from the time they started talking" that they would be charged "for all expenses of Mexican labor"; that "they (defendants) agreed to pay all expense"; and that, with respect to the various items of expense, "if I knew, I told them" and "as soon as I did know I told them." On

the other hand, defendants insisted that they never asked plaintiff to arrange for or procure Mexican labor for them; that, in response to defendants' inquiries in advance as to what Mexican choppers would cost, plaintiff told them "$5.00 a head to get the Mexicans up here" and 50¢ per hour for work performed; that, in response to similar inquiries in advance as to what Mexican pickers would cost, plaintiff said "we got them (pickers) contracted for $2.50 a hundred, and that is all they are going to get"; that plaintiff said nothing to defendants about any of the other items of expense for which he now seeks recovery (except that, when asked whether he had heard before suit about the "recruiting expense" of $16.50 each for the Mexican pickers, one defendant said "I don't know"); that defendants were not told in advance that expenses incident to procurement of Mexican labor would be charged against them; and, that they never agreed to pay any of those expenses, other than the charge of $5 each for hauling the 25 Mexican choppers to Missouri.

With respect to the choppers, defendants' position apparently is that they have no obligation other than for payment of the hauling charge of $5 each. With respect to the 46 Mexican pickers, defendants' position is that "defendants expected to pay * * * the customary charge made by gin operators, landlords and others who obtained Mexican laborers in this locality"; that "this customary charge was 50¢ per hundred pounds of cotton picked by such Mexican laborers," for which "gin operators, landlords and others who obtained Mexican laborers paid all costs of obtaining, transporting, insuring, housing and feeding such Mexican laborers, and in addition hauled all cotton they picked from the field to the gin"; and, that "Mexican laborers picked 175,625 pounds of cotton for defendants and if defendants owe plaintiff 50¢ per hundred pounds of cotton picked by Mexican laborers, or $878.13, such sum is offset by the sum of $888.86 owed by plaintiff to defendants," the latter sum including various items which (as defendants assert) should be charged against plaintiff in determination

of the net reasonable value of work and labor done by the Mexican pickers whom defendants used. On appeal, defendants concede, in effect, that they are liable in quantum meruit for the reasonable value of work and labor done by the Mexicans used by them, subject to the claimed "off-set".

No findings of fact or declarations of law were requested of, or given by, the trial judge, and the judgment does not indicate the theory on which it was rendered. However, being mindful of the fact that "(o)n appeal, the presumption always is that the decision of the lower court was correct" [State to Use of Consolidated School Dist. No. 42 of Scott County v. Powell, 359 Mo. 321, 221 S.W.2d 508, 511(7)], that " '(t)he presumption is that the court, in weighing the evidence, was governed by correct rules of law' " [Linders v. Linders, 356 Mo. 852, 204 S.W.2d 229, 234 (12)], and that, since "(n)o declarations of law were asked or given, * * * we therefore assume that the trial court tried the case upon a correct theory of law" (McDaniel v. Emmick, 149 Mo.App. 274, 130 S. W. 129, 130), we undertake to determine whether the judgment as to "expense of Mexican labor" should be sustained on any legal theory permitted by the pleadings and the evidence. Plaintiff's theory is not disclosed by his petition, which is framed in such language that it might be contended plausibly that recovery thereunder might be had under any one of three different theories, namely, either on an express written contract, or on an express oral contract, or on quantum meruit—a contract implied or created by law—an obligation "founded upon the fundamental principle that no one ought 'to enrich himself unjustly at the expense of another.' " Donovan v. Kansas City, 352 Mo. 430, 175 S.W.2d 874, 884(17), 179 S.W.2d 108, appeal dismissed 322 U.S. 707, 64 S.Ct. 1049, 88 L.Ed. 1551; Bailey v. Interstate Airmotive, 358 Mo. 1121, 219 S. W.2d 333, 338(4–6), 8 A.L.R.2d 710.

But where, as here, there has been no attack upon the petition prior to judgment, every reasonable intendment should be indulged in favor of the pleading. [Therrien v. Mercantile-Commerce Bank & Trust Co., 360 Mo. 149, 227 S.W.2d 708, 712 (10); Baugher v. Gamble Const. Co., 324 Mo. 1233, 26 S.W.2d 946, 949(4)], and the petition should be construed most favorably to plaintiff [Worley v. Worley, Mo.App., 176 S.W.2d 74, 77(4); Elmore v. Cox, Mo.App., 9 S.W.2d 681, 683(2)]. If the petition contains averments which, if proved, would entitle plaintiff to recover either on an express contract or on quantum meruit, and if it is impossible to say definitely whether plaintiff is counting on one or the other, he may be permitted to recover upon whichever of the two theories his evidence may warrant, [In re Hukreda's Estate, Mo.Sup., 172 S.W. 2d 824, 826(5); Skillman v. Ballew, Mo. App., 27 S.W.2d 1036, 1038(3)], and the allegations unnecessary to statement of the cause of action, on which recovery properly may be had, may be treated as surplusage and disregarded [Osborn v. Chandeysson Electric Co., Mo.Sup., 248 S.W.2d 657, 661 (2); Henry v. Cleveland, C., C. & St. L. Ry. Co., 332 Mo. 1072, 61 S.W.2d 340, 341(4), certiorari denied 290 U.S. 627, 54 S.Ct. 70, 78 L.Ed. 546; Jensen v. Turner Bros., Mo. App., 16 S.W.2d 742, 745(4)]. Viewing plaintiff's petition in the light of the stated principles, we think that, absent any attack upon it, the petition would be sufficient to sustain a judgment for plaintiff, if permitted under the law and supported by the evidence, on any of the three theories mentioned above.

However, plaintiff's primary reliance upon appeal seems to be on the theory of an express written contract. Plaintiff's argument proceeds along the line that the written contract authorized plaintiff "to decide the question of the necessity of employing Mexican labor at the expense of the defendants"; that defendants were charged with knowledge of Public Law 78 enacted by the 82nd Congress and approved July 12, 1951 (7 U.S.C.A. §§ 1461 to 1468, incl., 1951 U.S. Code Congressional and Administrative Service, Vol. 1, p. 117), with knowledge of the Bracero Treaty, otherwise known as the Migrant Labor Agreement of 1951, executed by the United States and Mexican gov-

ernments on August 8, 1951 (1951 U.S.Code Congressional and Administrative Service, Vol. 2, pp. 2713–2729), and with knowledge of the contents of the individual work contracts executed on September 7, 1951, by Semo, as employer, and the Mexican pickers; and, that these "rendered the defendants liable to the plaintiff" for the "expense of Mexican labor." This, on the legal principle loosely stated in plaintiff's initial brief that "laws existing at time and place of a contract form part of it."

■■■ We are unable to follow and adopt plaintiff's theory. In the first place, we cannot agree that plaintiff furnished Mexican labor to defendants under the written contract. It is true that Article III provided that, *"The landlord reserves the right at any time to enter upon the lands herein rented * * * and perform any and all labor and other work that the landlord may deem advisable for the proper cultivation, harvesting and marketing of * * * crops"*; but, as we read the record, plaintiff made no pretense of exercising this reserved right "to enter upon the lands herein rented," which, as the quoted contractual provision shows, would have been a necessary predicate for performance of work under Article III. Plaintiff's case was developed upon the premise that he had inquired of defendants from time to time whether they needed and wanted Mexican labor, and that he had arranged for and furnished such Mexican labor to defendants with their prior consent—in fact, at their request and upon their oral agreement to pay all expense incident thereto—a premise inconsistent with and repugnant to the idea of plaintiff's entry upon the leased lands under Article III. The clear and unambiguous terms of the written contract are conclusive.[1] We are confined to interpretation

and enforcement of the contract which the parties made for themselves, and we cannot alter or rewrite it under the guise of judicial construction.[2] Considering the written contract as a whole, as we must do,[3] we find nothing therein which invested plaintiff with authority to incur on behalf of defendants the disputed "expense of Mexican labor."

■■■ Furthermore, the rule concerning existing laws becoming a part of a contract " 'is elaborated to the effect that the laws *which exist at the time and place of making a contract* and at the place where it is to be performed, *affecting its validity, construction, discharge, and enforcement,* enter into, and form a part of, it, as if they were expressly referred to or incorporated in its terms.' " (All emphasis ours.) Curators of Central College v. Rose, Mo.Sup., 182 S.W.2d 145, 149(4), appeal dismissed 323 U.S. 678, 65 S.Ct. 269, 89 L.Ed. 550; Swabey v. Boyers, 274 Mo. 332, 203 S.W. 204, 205(1); 12 Am.Jur., Contracts, Sec. 240, p. 771. "It is a rule of universal application that a contract or other written obligation is to be construed in the light of the law *as it existed at the time the obligation was entered into.*" Hubbard v. Hubbard, Mo.App., 264 S.W. 422, 423(1). See also Bowers v. Kansas City Public Service Co., 328 Mo. 770, 41 S.W.2d 810, 812–813 (4, 5); State ex rel. Hobart v. Smith, 173 Mo. 398, 73 S.W. 211, 217. Although Mexican labor theretofore had been imported under what was known as "the 1949 agreement" between the United States and Mexican governments (1951 U. S. Code Congressional and Administrative Service, Vol. 2, p. 1570), there was no counterpart in the Agricultural Act of 1949, 7 U.S.C.A. § 1421 et seq., (1949 U. S. Code Congressional Service, Vol. 1, pp. 1061–1071), for the statutory provisions *subsequently* embodied in

1. Holland Land & Loan Co. v. Holland, Mo.App., 274 S.W. 951, 959(4), affirmed 317 Mo. 951, 298 S.W. 39, 45(3); Campbell v. Webb, 356 Mo. 466, 202 S.W.2d 35, 39(4); 17 C.J.S., Contracts, § 296, pp. 695–697.

2. Forir v. Toman, Mo.Sup., 202 S.W.2d 32, 34(4); Greaves v. Huber, Mo.App., 235 S.W.2d 86, 90(5); Gromer v. Watson,

Mo.App., 233 S.W.2d 45, 47(1); Greene County Building & Loan Ass'n v. Milner Hotels, Inc., 240 Mo.App. 1048, 227 S.W. 2d 111, 122(4).

3. In re Collins' Trust Estate, 354 Mo. 614, 190 S.W.2d 259, 262(4); McManus v. Farmers Mut. Hail Ins. Co. of Missouri, 239 Mo.App. 882, 203 S.W.2d 107, 112 (4); 17 C.J.S., Contracts, § 297, p. 707.

Public Law 78, approved on July 12, 1951, which was "An Act to amend the Agricultural Act of 1949" by *adding* Title V thereto. Thus, when the written contract was executed, there were no statutes pertaining to importation of Mexican labor which, by any stretch of legalistic imagination, could have been said to have been embodied in the written contract.

■ However, plaintiff asserts in his reply brief that Public Law 78 (7 U.S.C.A. §§ 1461 to 1468, incl.) and the Migrant Labor Agreement of 1951 nevertheless became a part of the written contract because "private contracts not only incorporate all the laws existing at the time they are entered into, but are likewise entered into with the full knowledge that the existing law might be changed, and if changed, that the amended law likewise is incorporated in the private contract as fully as if set out verbatim therein." But, this does not follow from the cases cited to this point,[4] which announce the basic doctrine, wholly inapplicable here, that "the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order" (Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413, 427), or, as otherwise stated, that "(c)ontracts, however express, cannot fetter the constitutional authority of the Congress." (Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 307, 55 S.Ct. 407, 416, 79 L.Ed. 885, 902).

■■ Finally, application of the general rule concerning existing laws becoming a part of a contract is limited, in any event, to *"applicable"* statutes, (Curators of Central College v. Rose, supra, 182 S.W.2d loc. cit. 149), *"which affect 'the validity, construction, discharge, or enforcement of the contract'* * * * and care should be

taken that * * * application (of the rule) is not extended to lengths which approach absurdity." [Wing v. Forest Lawn Cemetery Ass'n, 15 Cal.2d 472, 101 P.2d 1099, 1101(2), 130 A.L.R. 120, 124(3)]. "The laws with reference to which the parties must be assumed to have contracted * * were those which in their direct or necessary legal operation controlled or affected the obligations of such contract." Connecticut Mut. Life Ins. Co. v. Cushman, 108 U.S. 51, 65, 2 S.Ct. 236, 245, 27 L.Ed. 648, 653(6). Certainly, Public Law 78 approved on July 12, 1951, was *not* a statute "which in (its) direct or necessary legal operation controlled or affected the obligations" of the written contract of January 10, 1951, particularly in view of the fact that the importation of Mexican labor was neither mentioned in, nor within the contemplation and scope of, the written contract. We conclude that plaintiff cannot recover upon the written contract for "expense of Mexican labor" and that the judgment of the trial court cannot be sustained on the theory that this was an action on an express written contract.

■ There was some evidence to support a theory of recovery on an express *oral* agreement subsequent to the written contract. The furnishing of Mexican labor in the instant case was a matter which, although related in a general sense to the written contract, was independent thereof, did not vary or contradict the express or implied provisions thereof, and did not invade the field which the written contract had undertaken to cover. It, like the spraying, was a subject with which the parties naturally would deal separately, if at all. Accordingly, evidence of a subsequent parol agreement about Mexican labor, independent of and not inconsistent with the written contract, was admissible.[5] But, we

4. Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434–435, 54 S.Ct. 231, 78 L.Ed. 413, 427(6), 88 A.L.R. 1481; Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 307–311, 55 S.Ct. 407, 79 L.Ed. 885, 902–904(10, 11); Meyer v. City of Eufaula, Okl., 10 Cir., 154 F.2d 943, 945 (2); In re Maier Brewing Co., D.C., 38 F.Supp. 806, 818(12); General Theatres v. Metro-Goldwyn-Mayer D. Corp., D.C., 9 F.Supp. 546, 550(7).

5. Van Studdiford v. Hazlett, 56 Mo. 322, 324(1); Chambers v. Board of Education of Town of Cameron, 60 Mo. 370, 379 (3); England v. Houser, 163 Mo.App. 1, 145 S.W. 514, 516(2); Bruckman v. Har-

think it apparent from the judgment, itself, that it was not entered on the theory of an express oral agreement subsequent to the written contract—on plaintiff's testimony that "they (defendants) agreed to pay all expense." For, a finding to that effect would have impelled a judgment for *plaintiff* on item 17 for "recruiting expense" of $16.50 each for the 46 Mexican pickers. In view of the court's finding for *defendants* on item 17, the judgment cannot be sustained on the theory of an express oral agreement "to pay all expense."

■■■■ Where the doctrine of quantum meruit is appropriately invoked, the promise implied by the law is to pay the reasonable value of the work and labor done or of the services rendered.[6] The judgment permitting recovery for various payments by plaintiff to Semo and others obviously was not reached on the theory that defendants were obligated in law to pay the reasonable value of work and labor done by the Mexicans whom defendants used, and the judgment cannot be sustained on the theory of quantum meruit.

■■■■ Since the judgment cannot be affirmed on any theory, and since, by reason of the irreconcilable conflict in the evidence on the issues of fact presented, proper determination of which depends so completely on the credibility of witnesses and on the weight and value to be accorded to their testimony, "a situation prevails wherein the application of the rule of deference to the findings and conclusions of the trial (judge) is especially appropriate and necessary" [State ex rel. Taylor v. Anderson, Mo.Sup., 254 S.W.2d 609, 615(8)], we have

concluded that "justice requires" [Sec. 512.-160(3)] that the case be reversed and remanded for retrial upon the items of "expense of Mexican labor" (excepting items 13 and 15) without any finding by us as to whether plaintiff should recover on an express oral agreement subsequent to the written contract or on quantum meruit. The judgment of this court is that the cause be reversed and remanded for retrial upon items 14 and 16 to 28, inclusive, with directions that, when judgment upon those items is entered following retrial, (a) judgment for plaintiff be entered upon item 10 in the sum of $535.05 with interest at 8% from and after June 9, 1951, upon item 11 in the sum of $535.05 with interest at 8% from and after July 8, 1951, upon item 12 in the sum of $615 with interest at 8% from and after August 25, 1951, upon item 15 in the sum of $125 with interest at 8% from and after July 10, 1951, and upon item 29 in the sum of $100 with interest at 8% from and after December 31, 1951, (b) judgment for defendants be entered on item 13, and (c) the credits shown in items 30 to 35, inclusive (with interest from and after the respective dates of accrual), be allowed to defendants and the judgment for plaintiff be reduced thereby *if* judgment for plaintiff be rendered on an express oral agreement subsequent to the written contract, or, in the alternative, the credits shown in items 32 to 35, inclusive (with interest from and after the respective dates of accrual), be allowed to defendants and the judgment for plaintiff be reduced thereby *if* judgment for plaintiff be rendered on quantum meruit.

McDOWELL and BLAIR, J., concur.

gadine-McKittrick Dry Goods Co., 91 Mo.App. 454, 462; Montieth v. Great Western Printing Co., 16 Mo.App. 450, 452; Smith v. Cloyd, 260 Ky. 393, 85 S.W.2d 873, 874(2); 32 Am.Jur., Landlord and Tenant, Sec. 133, pp. 136–137; 20 Am.Jur., Evidence, Sec. 1163, p. 1016; 12 Am.Jur., Contracts, Sec. 428, pp. 1006–1008; anno. 25 A.L.R. 787, 809–816; anno. 88 A.L.R. 1380, 1392–1397; anno. 151 A.L.R. 279, 289–292.

6. Muench v. South Side Nat. Bank, Mo. Sup., 251 S.W.2d 1, 6(10); American Displays v. E. T. Swiney, Motors, Mo. App., 240 S.W.2d 732, 735; Klein v. Terminal R. Ass'n of St. Louis, Mo.App., 268 S.W. 660, 663(2); 58 Am.Jur., Work and Labor, Sec. 10, p. 518.