Francis M. SHARP, II, Eaton Truck Line, Inc., by its Receiver, Fred A. Murdock, Third-Party Plaintiff-Appellant,

v.

INTERSTATE MOTOR FREIGHT SYSTEM, Respondent.

No. 53371.

Supreme Court of Missouri, En Banc.

June 25, 1969.

William M. Austin, Walter R. James, North Kansas City, Lane Bauer, Kansas City, for appellant.

William H. Sanders, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, J. M. Neath, Jr., Warner, Norcross & Judd, Grand Rapids, Mich., for respondent.

HOUSER, Commissioner.

This is an appeal by third-party plaintiff Eaton Truck Line, Inc., by its receiver Fred A. Murdock, from a judgment entered in a third-party proceeding. Interstate Motor Freight System, a Corporation, is third-party defendant.

Third-party plaintiff Eaton sought a declaratory judgment with reference to the rights, duties and liabilities of the parties arising out of a contract of sale of Eaton's rights to operate as a common carrier of property in interstate commerce by motor vehicle, and a contract of lease made thereunder; for a cease and desist order, and for judgment against Interstate "for the amount of the benefits it is determined Interstate has derived from the conduct of the operations covered by the subject operating rights, without a lease of such operating rights from February 11, 1965 to date of judgment (alleged to be $7,100 per day from May 12, 1965 until it ceases its operations), for the amount of expenses the Receiver has incurred to date of judgment (alleged to be 'substantial') resulting from the aforesaid conduct of Interstate * * *." Third-party defendant Interstate filed a counterclaim for breach of contract, praying for damages "equal in amount to all sums paid by Strickland Transportation Co., Inc. to Receiver Murdock under the so-called agreement between them of April 6, 1965 (alleged to be $1,600 per month from and after May 5, 1965 'to the present time'), plus reasonable attorney fees and costs incurred" in the litigation.

The limited issue tried was the liability of the parties under the contract and lease. This issue was defined by a pretrial order as follows: "The trial of this cause shall be limited to the issues of liability between the parties, together with the right of the parties to recover damages either on third-party plaintiff's petition or third-party defendant's counterclaim, together with all other issues relating to relief sought by the pleadings, but no evidence shall be received nor will any determination be made by the Court as to dollar amount of damages to be recovered by either party."

The judgment from which third-party plaintiff Eaton appealed found that Eaton was not entitled to the declaratory relief it sought, or injunctive relief or damages. It declared the contracts of October 3 and 4, 1962 still operative; that Interstate is not precluded by the terms of the contracts from purchasing Eaton's rights and is not estopped therefrom by its conduct, and that Interstate has a continuing right to purchase and lease the Eaton certificates and operating rights, subject to approval by the Interstate Commerce Commission. Third-party defendant Interstate was adjudged to take nothing on its counterclaim against Eaton. It was further ordered that

the judgment on the limited issue be deemed a final judgment for the purpose of appeal.

■ The effect of the court's finding was to deny each claim of third-party plaintiff Eaton, including its claim for damages in a sum far exceeding the amount which establishes jurisdiction in this Court. We therefore have jurisdiction of this appeal by reason of the amount in dispute, notwithstanding the issue tried was limited to the question of liability, on analogy to the cases of Conley v. Fuhrman, Mo.Sup., 355 S.W.2d 861; Bogus v. Birenbaum, Mo. Sup., 375 S.W.2d 156; Finley v. Smith, Mo.App., 170 S.W.2d 166, transferred, 352 Mo. 465, 178 S.W.2d 326; Crouch v. Tourtelot, Mo.Sup., 350 S.W.2d 799, and Superior Concrete Accessories v. Merle E. Kemper Co., Mo.Sup., 284 S.W.2d 482.

On October 3, 1962 Eaton and Interstate entered into a written contract, subject to approval by ICC, for the sale by Eaton and purchase by Interstate of all of Eaton's rights to operate as a common carrier of property in interstate commerce by motor vehicle, including rights evidenced by two certificates of convenience and necessity issued by ICC, for $105,000. Interstate agreed to apply for authority for the transaction, which was to be consummated within the period prescribed by ICC, "but if the Interstate Commerce Commission, by final order, denies authority to transfer the involved rights, then Purchaser shall have the right to assign this contract to any person or corporation which is not a carrier as defined by the Interstate Commerce Act, provided that said assignment is made within thirty (30) days of the effective date of said final order and Seller receives written notice thereof within said period. Otherwise, neither party shall have any further rights or obligations hereunder." The contract further provided that "Pending final approval of this transaction, the parties will seek authority for Buyer to temporarily lease and operate," and provided for payments of $1,600 per month by buyer to seller until an application "for permanent authority to purchase said Certificate is disposed of; provided that if and when rental payments reach a total of One Hundred Five Thousand Dollars ($105,000.00), no further rental payments shall be required. * * *"

On October 4, 1962 Eaton and Interstate entered into an ancillary written lease of Eaton's operating rights to Interstate, by which the parties agreed to promptly file application with ICC for authority for transferee temporarily to conduct operations under transferor's rights; agreed that in the event such temporary authority was granted transferee should conduct operations as authorized by transferor's certificates "until final determination of the application for permanent authority," and that transferee pay $1,600 per month during the period of such temporary authority. Such payments were agreed to be credited upon the purchase price "in the event of approval of such transfer." No further rental payments were to be required if and when rental payments reached a total of $105,000.

Interstate applied for and was granted temporary authority and on October 17, 1962 began operating thereunder between St. Louis and Kansas City.

Interstate's application for authority to sell and transfer was heard by an ICC hearing examiner who in March, 1964 filed a recommended report denying approval of the purchase by Interstate. The latter filed exceptions. At that juncture Eaton went into receivership. On November 16, 1964 ICC made an order adopting the hearing examiner's recommendations. Interstate filed a petition for further hearing. On February 10, 1965, by an order effective February 11, 1965, ICC denied Interstate's petition for further hearing, adopted the hearing examiner's recommended report and order, and set an effective date for the termination of operations by Interstate ninety days thereafter, or May 12, 1965. On February 13 or 15 Interstate's general counsel and secretary informed Eaton's receiver that ICC had denied Interstate's ap-

plication; that Interstate was not going to follow the procedure for judicial review, but that Interstate would be willing to join in such a procedure if Eaton or the receiver wanted a review; that there was a possibility that Interstate might want to exercise its right to assign the Eaton rights, in which event Interstate would want to work out some kind of an inter-line agreement. On February 18 Interstate's vice-president informed the receiver that Interstate was not going to assign the contract to a noncarrier and that the receiver should seek another buyer, arrange "to get the rights in operation" and have his attorney call Interstate's general counsel and arrange for "an orderly turnover" of the operation. Eaton's counsel communicated with Interstate's general counsel and confirmed the fact that Interstate was not going to seek judicial review or assign its rights. On February 22 Interstate's general counsel and secretary told an attorney for Eaton and its principal stockholders that the management and directors had decided not to appeal or seek to enjoin enforcement of the ICC order and not to assign the operating rights under the contract, but suggested that Interstate would be pleased if the receiver appealed the ICC order; that Interstate would cooperate in any reasonable way in furthering such an appeal. Counsel for Eaton "told him very bluntly we [Eaton and the receiver] were not in any financial position to do this." Interstate's representative said that Interstate would operate until May 12 but not thereafter. Eaton's counsel informed Interstate's representative that Eaton and the receiver would find a new purchaser or in some way try to save the operating rights from lapsing and being extinguished. Eaton and the receiver began looking for a new purchaser. Interstate revoked its powers of attorney with the freight tariff bureaus as they related to Eaton's rights; issued instructions to the bureaus that its tariff provisions were to be cancelled effective May 12, 1965, and cancelled the lease on its Missouri terminal premises at Wind-

sor effective May 12, 1965. On March 10 Interstate's general counsel and secretary advised a creditor of Eaton that Interstate would terminate operations on May 12, 1965; that it did not intend to assign, but that Interstate hoped the receiver and the attorneys for the principal stockholders of Eaton would appeal, although they had "heard nothing further from them." Interstate paid its lease money for the month of May for the first twelve days only. Interstate did not at any time exercise its contractual right to make an assignment. On April 7, 1965, in reliance on the assurances and conduct of Interstate's officers and general counsel, Eaton's receiver entered into a contract to sell Eaton's rights to Strickland Transportation Company, Inc., of Dallas, Texas, for $112,500 and leased Eaton's rights to Strickland pending ICC approval of the purchase contract. On April 7 Interstate's general counsel, at the request of counsel for the receiver, agreed to supply detailed financial data for use in connection with the preparation of a "Section 5" application by a prospective purchaser for ICC approval of a contract for the purchase of the Eaton rights. Interstate was advised at that time that the receiver had entered into a tentative agreement to sell the rights and that an application was to be made to the receivership court for approval of the sale. On the next day, April 8, Interstate by air freight shipped several boxes of financial data to Strickland at Dallas, Texas. The receiver applied to the receivership court and obtained approval of the contracts with Strickland on April 14.

On May 6 or shortly thereafter Interstate's president, having learned that ICC had granted Strickland temporary authority to operate the Eaton rights, in a 180-degree reversal of position directed company counsel to seek judicial review of the ICC order of February 10. Pursuant to instructions Interstate's counsel prepared and on May 10 filed in a federal district court in Michigan a suit to enjoin enforcement of ICC's

order of February 10. The federal court issued a temporary and eventually a permanent injunction vacating and setting aside the order of February 10, the effect of which was to stay the effective date of the ICC order of February 10, thus permitting Interstate to continue under its temporary authority. Thus the anomalous situation developed in which at least for a time both Interstate and Strickland were operating the same rights under temporary permits. Plaintiff's Exhibit 35 is a report and order of the ICC hearing examiner upon further hearing of the Interstate and Strickland applications for authority, dated August 18, 1966, in which both applications were denied and the temporary authorities previously granted to both were ordered terminated 90 days from the service date of the order. There is nothing in the record or exhibits to indicate whether the ICC has finally passed upon the report of the hearing examiner, and whether a choice has finally been made between the rival applications of Interstate and Strickland.

The circuit court ruled in effect that by the use in the contracts of the terms "final order," "final approval" and "final determination of the application for permanent authority" the parties intended and meant a final unappealable decision of a court of last resort; that in the drafting of these contracts the parties contemplated and intended to reserve the right to appeal adverse rulings of ICC by the method of judicial review provided in 5 U.S.C.A., Chapter 7, and did not contemplate that their rights should terminate when their remedies before the administrative agency were exhausted; that judicial review having been sought there has not yet been any "final determination of the application for permanent authority," but that Interstate's right to purchase has been extended by the review procedure; that the contracts are still operative and Interstate has not been precluded from purchasing the rights, if it can win ICC approval on a further application.

The receiver's first two points challenge this ruling. The receiver contends that Interstate's right to purchase terminated on February 11, 1965, the effective date of the ICC order [no assignment having been made by Interstate during the following 30-day period], for two reasons: first, because of the language of the contracts; second, because Interstate is estopped by its conduct from denying the validity of the receiver's contract with Strickland.

■ On this review of a court-tried, jury-waived case it is our duty not to set aside the judgment unless clearly erroneous. Civil Rule 73.01(d), V.A.M.R.

*On the construction of the contracts:* the receiver contends that the ICC order effective February 11, 1965 was the *final order* of ICC within the contemplation of the contract as the terms "final order," "final approval" and "final determination of the application for permanent authority" are used therein; that by the use of these terms the parties intended and meant that ICC's final order denying the authority would effectively discharge the contracts and end all rights under the contract, except for the right to assign within 30 days after the final order (a right never exercised); that the timetable agreed upon by the use of the above-quoted terms contemplated only agency action and not that the terminal date as thus defined be extended by taking steps looking to judicial review.

■ These terms refer to administrative finality; final agency action; final action of ICC in this instance. By using these terms, however, the parties did not necessarily fix the terminal date of their rights under the contract at a time 30 days after the date on which the ICC order should become administratively final. The contracts did not expressly so provide. The parties did not agree that ICC be the final arbiter. There was no provision that the parties would be conclusively bound by

ICC's final order. The parties could have, National Surety Corp. v. Fisher, Mo.Sup., 317 S.W.2d 334, but did not, waive their right to obtain a judicial review. Such a right will be held to have been expressly waived only where the intention to waive clearly appears from the terms of the agreement and is supported by sufficient consideration. 4 C.J.S. Appeal & Error § 210c. A waiver may be implied from acts or conduct but to have implied waiver the acts and conduct depended upon must be clearly inconsistent with the right. 4 C.J.S. Appeal & Error § 211. The right to a judicial review, as indicated, was not expressly waived in the contracts of October 3 and 4. Nor is a waiver to be implied under the facts and circumstances. The parties' construction of their rights in this respect sheds light on their intention at the time they contracted. After ICC acted with administrative finality the parties unquestionably contemplated the possibility of judicial review. They considered and discussed whether such proceedings should be instituted. Interstate, at first declining to initiate the proceedings, expressed the idea that it would be pleased if the receiver sought review. (Evidently Interstate hesitated because of apprehension that pursuing judicial review might interfere with the relationship between Interstate and ICC, with whom Interstate was obliged to deal constantly.) The receiver indicated that he could not pursue the remedy because of financial embarrassment. The receiver contracted with Strickland on the basis of Interstate's representations that the latter was not going to seek judicial review. When the president of Interstate learned that Strickland had been granted temporary rights Interstate changed its position with reference to appeal, and actively sought, pursued and procured a judicial review of the ICC order.

A federal statute [1] in full force and effect on October 3, 1962 granted the right of judicial review to anyone adversely affected by an agency order. It is a fundamental rule that the laws which exist at the time and place of making a contract, and at the place where it is to be performed, affecting its validity, construction, enforcement, termination and discharge, enter into and form a part of the contract as if they were expressly referred to or incorporated therein. Christy v. Petrus, 365 Mo. 1187, 295 S.W.2d 122, 125 [2]; Curators of Central College v. Rose, Mo.Sup., 182 S.W.2d 145, 149 [4]; Swabey v. Boyers, 274 Mo. 332, 203 S.W. 204, 205 [1]; Hubbard v. Hubbard, Mo.App., 264 S.W. 422, 423 [1]; Bowers v. K. C. Pub. Serv. Co., 328 Mo. 770, 41 S.W.2d 810, 812–813 [4, 5]; State ex rel. Hobart v. Smith, 173 Mo. 398, 73 S.W. 211, 217; Emerson v. Treadway, Mo. App., 270 S.W.2d 614. This statute in its "direct or necessary legal operation controlled or affected the obligations of" the contracts in question. See Connecticut Mut. Life Ins. Co. v. Cushman, 108 U.S. 51, 65, 2 S.Ct. 236, 245, 27 L.Ed. 648, 653 [6]. There having been no contractual provision excluding the right of judicial review, the statutory provision of this right entered into and formed an integral part of the contracts of October 3 and 4 the same as if expressly referred to or incorporated therein. The time within which Interstate could exercise its rights under these contracts, therefore, was extended for the period of judicial review, unless under the circumstances of this case Interstate was estopped.

It is argued that the time within which an aggrieved party might seek judicial review is limited only by the operation of the doctrine of laches and that as a practical matter parties to a contract of this type would not enter into such an "open-end" agreement with no specified time limit for the filing of proceedings looking to judicial review; that reasonable businessmen would not wish to be obligated under such contingencies and uncertainties. The answer

---

1. 5 U.S.C.A. § 702: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

to this argument is that both contracting parties, aggrieved by the refusal of ICC to give its approval to the transaction in which they were jointly interested, had control over the time within which the review would be sought. Either could file the proceedings for judicial review at any time after the ICC order became administratively final.

◼ *On the issue of estoppel:* Just as a party may be estopped from taking an appeal by acts performed after the rendition of the order or judgment which are clearly inconsistent with the right of appeal, Winsor v. Schaeffer, 224 Mo.App. 1220, 34 S.W.2d 989, and authorities cited, 990; 4 C.J.S. Appeal & Error § 211, so a party may be estopped from claiming rights or benefits arising from the taking of an appeal. Likewise a party may be estopped by conduct from claiming rights or benefits arising out of a contract, or from denying the validity of another's contract. Without a duplicating recital of the facts suffice it to say that Interstate's conduct after February 11, 1965 in making representations to the receiver that it would not seek judicial review of the ICC order; its encouragement of the receiver to find another buyer and its action, after receiving constructive notice of the fact that the receiver had contracted with another for the sale of the Eaton rights, in seeking judicial review and renewing its insistence on its contractual rights after the receiver in reliance on Interstate's representations had changed his position, make out a case of estoppel, *except for the element of detriment* to the receiver. The circuit court concluded, and we find, that detriment was not shown in view of evidence that the receiver had an indemnifying agreement to protect him; that he had procured a new sale for a price greater than that which Interstate agreed to pay, and that he was receiving a total of $3,200 in monthly payments under two leases, instead of $1,600 under one. For the lack of a showing of this essential element the plea of estoppel must be disallowed.

The receiver asserts that there was detriment (1) "by reason of all the legal proceedings caused by Interstate's conduct"; (2) "based upon unjust enrichment" [citing Interstate's allegation in one of the proceedings that it had profits of $7,100 a day arising out of the operation of the Eaton rights], and (3) arising out of the indemnity agreement with Strickland, but that no attempt was made to prove these because of the pretrial order, supra. Doubtless the litigation was burdensome and disadvantageous, causing the receiver considerable loss of time and money (although there is no evidence of this and any such conclusion must be based upon inference). Even so, at least as to the litigation initiated by the receiver, there is "some difference of opinion as to whether the bringing of a suit or other legal proceeding is a change of position within the law of estoppel." 28 Am.Jur.2d Estoppel and Waiver § 77, p. 714. Without expressing ourselves unnecessarily on this subject it is clear that legal detriment within the law of estoppel refers to detriment caused by a wrong or by the action or nonaction of the party claiming the estoppel in rightful reliance upon the truth of a representation, 31 C.J.S. Estoppel § 74, p. 452, fn. 41, and case cited, but does not include a detriment or disadvantage which it was within the power of the one asserting the estoppel to avoid or prevent. Apprised of Interstate's reversal of position the receiver was confronted with a choice between the two contracting parties. Either he had to repudiate the Strickland contract and perform his contractual obligations to Interstate or vice versa. He could have renounced the Strickland contract without suffering any loss or detriment, because of the protection afforded by the indemnity agreement signed by Strickland, but this he did not choose to do. Instead he chose to repudiate the Interstate contract and to do everything within his power to uphold the Strickland contract. As a result of this conscious choice the receiver became embroiled in numerous litigations. In effect he caused

or brought on himself any such consequential trouble and expense. Whatever detriment he suffered in this connection was self-inflicted.

■ The receiver, claiming a right to recover large sums from Interstate on the theory of unjust enrichment, has advanced no basis for the claim and has cited no authorities supporting a recovery on the basis of a contract implied in law. We find nothing to indicate that Interstate was enriching itself unjustly at the expense of the receiver. Interstate's temporary operations under Eaton's permit were maintained under an express written contract by the terms of which Interstate paid for the privilege at the rate of $1,600 per month.

■ The receiver further claims that the indemnity agreement signed by Strickland is not all-inclusive; that Strickland may be able to recover damages from the receiver for breach of contract, in which event damages would be recoverable by the receiver against Interstate. This theory is speculative, undeveloped and insubstantial. To remand the case for a trial of this issue would be like grasping for straws.

■ We do not pass upon the receiver's point that the court erred in admitting the testimony of Interstate's lawyer who wrote the contracts of October 3 and 4, for the reason that this case was a court-tried case which on appeal we have reviewed as in the case of an appeal in an equity case. Having found that the circuit court correctly ruled it is now immaterial whether in reaching that result the judge may have erroneously considered some incompetent evidence.

No point having been raised as to the judgment on the counterclaim the determination of the court on that issue has become final.

The judgment below is not clearly erroneous. The court reached the right result and for the reasons given the judgment is affirmed.

PER CURIAM:

The foregoing opinion by HOUSER, C., written in Division One, is adopted as the opinion of the Court en Banc. The judgment is affirmed.

All concur except SEILER, J., who dissents and adopts as his dissenting opinion the Memorandum of Dissent by WELBORN, C., and dubitante as to disallowance of plea of estoppel.

WELBORN, Commissioner (dissenting).

I must respectfully dissent from the opinion of Judge HOUSER in this case. The trial court concluded that the contract should be interpreted to extend the rights of Interstate for a term which would include the time permitted for judicial review of the Interstate Commerce Commission's order denying authority to transfer the rights. The trial court reached its conclusion on the basis of the testimony of the draftsman of the contract, the attorney for Interstate, that he intended to provide for judicial review. Judge HOUSER does not accept the trial court's basis for interpretation of the contract, but reaches the same result, primarily on the theory that the existing law provided for judicial review of the order and that the parties to the contract must be presumed to have contracted with reference thereto.

The trial court undoubtedly applied an improper standard of interpretation when he relied on the statement of the draftsman, the representative of a party to the contract. The correct standard of interpretation is set out in § 230 of the Restatement of Contracts, p. 310, as follows:

"The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is

the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean."

This standard would preclude reliance upon the statement of the draftsman as the basis for interpreting the agreement.

The rule relied upon by Judge HOUSER is of limited value in this case. Corbin rejects such a rule as a rule of interpretation for contracts. As he points out: " * * * [A]fter the terms of a contract have been interpreted, its legal operation can be determined only with due reference to all applicable constitutions, statutes and doctrines of the common law; but this is not a rule of Interpretation and the statutes and rules of law are certainly not incorporated into the contract." 3 Corbin on Contracts, § 551, p. 197. None of the cases cited in the opinion actually employed this rule in the interpretation of a written contract. The case of Connecticut Mutual Life Ins. Co. v. Cushman, 108 U.S. 51, 65, 2 S.Ct. 236, 245, 27 L.Ed. 648, cited in the opinion, states: "The laws with reference to which the parties must be assumed to have contracted * * * were those which in their direct or necessary legal operation controlled or affected the obligations of such contract." See Emerson v. Treadway, Mo. App., 270 S.W.2d 614, 623 [23, 24]. Here, the parties were free to contract as they saw fit as to when the rights and obligations under the contract should terminate. Interstate's counsel acknowledged that the phrase "final order" might refer either to "administrative finality" or what he referred to as "constitutional finality," involving the right of judicial review. The problem is one of interpretation in the light of this admitted ambiguity.

In my opinion, the standard of interpretation quoted above from the Restatement must be applied. Considering the language of the agreement in the light of the relevant surrounding circumstances, I am of the opinion that the proper interpretation of the contract is that the rights of the parties thereunder were to terminate 90 days after the Interstate Commerce Commission's order became final, within the meaning of the statutes and rules governing the action of that agency.

Of significance is the fact that a denial by the Interstate Commerce Commission of authority to transfer rights was seldom subjected to judicial review. The absence of such practice would indicate that neither party contracted with a view to such right. More important, however, is the fact that a contract limited to expire based upon the exercise of the right of judicial review, would be, in effect, an open-end agreement, because, as witnesses for both sides agreed, there is no definite period within which the right of review must be exercised. That the parties would so contract appears unreasonable, in the light of the definiteness which the interpretation contended for by the receiver would bring to the agreement. The conduct of Interstate's officers, as set out in Judge HOUSER's opinion, following the publication of the February 10, 1965 order of the Interstate Commerce Commission indicates that they considered the February 11 effective date of such order as the "final order" referred to by the agreement. True, there was evidence of some discussion of judicial review, but none indicating that either party might, by the exercise of such right, necessarily prolong the duration of rights and obligations under the contract.

In my opinion, the contract should be interpreted as one under which Interstate's rights terminated on May 12, 1965, and the obligations of the parties, in this litigation, should be determined accordingly.