ELMER MCMANUS v. FARMERS MUTUAL HAIL INSURANCE COMPANY OF MISSOURI.—203 S. W. (2d) 107.

Springfield Court of Appeals. May 2, 1947.

Rehearing denied June 10, 1947.

*Alexander, Ausmus & Harris;* and *Ward & Reeves* for appellant.

*Bradley & Noble* for respondent.

VANDEVENTER, J.—This is an action on a hail insurance policy. For clarity we will refer to appellant as defendant and to respondent as plaintiff. The petition alleges that the defendant is a mutual insurance corporation under the laws of this state and that on May 30, 1945, it issued a policy to the plaintiff for a premium of $126.00, which was paid by plaintiff, on 70 acres of cotton up to the amount of $50.00 per acre grown on a certain piece of land, which was described, in Dunklin County, Missouri. The policy was.to be in effect from 11:50 A. M. May 30, 1945 until 12:00 noon September 15, the same year. That on June 16, plaintiff had planted and had up to a stand, for more than 15 days but less than 30 days, 67 acres of cotton. That on June 16, the terms of the policy were in force for a maximum coverage of 2/3 of $50.00 per acre or $2,233.32; that about 7:30 P. M. on June 16, 67 acres of cotton were struck by a hail storm, 55 acres totally destroyed and 12 acres damaged 50%. That the total loss to plaintiff was $8,531.25, which was far in excess of the insurance coverage. That defendant was duly notified of said loss and on July 6 proof of loss was submitted to defendant and that all other provisions of the policy, not waived by the defendant, had been complied with. That demand for payment in the sum of $2,233.32 had been made and refused. A copy of the policy was attached to the petition.

Defendant's amended answer, upon which the case was tried, admitted that it was a corporation, denied that it insured against losses on the real estate mentioned in the petition, denied that plaintiff had 67 acres of cotton planted and up to a stand for more than 15 days but less than 30 days, denied that under the terms of the policy it owed $2,233.32, denied that 67 acres of cotton were struck by hail and totally or partially destroyed; denied that the reasonable value of the cotton was $8,531.25, denied that proof of loss was furnished or that it was notified of any loss; denied that it had refused to pay said loss or that its action was vexatious or without reasonable cause and denied that it had sufficient information to either affirm or deny

whether the policy attached to the petition was a policy written by it, and as an affirmative defense, asserted that plaintiff had failed to arbitrate the loss, if any, as provided by the policy and by-laws of the defendant. It then quoted a provision of the application, a provision of its by-laws printed on the back of its policy and part of a written agreement, between plaintiff and defendant, to arbitrate. These will be more fully set out later in this opinion.

In its reply to defendant's amended answer, plaintiff admitted signing an arbitration agreement but denied any responsibility for the failure to arbitrate but insists that the failure of the arbitration was the fault of defendant in that defendant's arbitrator, W. F. Brooks, insisted upon the selection of a person living at an unreasonable distance from the locality of the loss and about which the arbitrator could not learn anything without considerable expense and trouble in investigating. That plaintiff's arbitrator tried to get defendant to agree on someone in the vicinity or within reasonable distance of the loss but that he refused to consider the proposition but insisted on selecting a person living at an unreasonable distance who could not be investigated without unreasonable expense and time and that by defendant's arbitrator's refusal to agree to someone nearer the place of loss, the requirement of the policy respecting arbitration was waived and defendant is now estopped from asserting said requirement in defense of this action. The case was tried to a jury and the jury returned a verdict in favor of plaintiff.

Defendant moved for a directed verdict at the close of the plaintiff's evidence and at the close of all the evidence, which motions were by the court overruled.

On appeal the defendant asserts the following reasons why the case should be reversed: I. The court erred in overruling defendant's motion for directed verdict (a) because plaintiff wholly failed to make a submissible case by failing to prove that he had sustained any loss, (b) because the plaintiff failed to show that he had a policy of insurance covering crops on the land described in the petition and (c) because the policy of insurance contained a provision for appraisal, in case of loss, and that because of the arbitrary conduct of plaintiff the appraisal failed.

II. It was error to admit plaintiff's Exhibit No. 3.

III. Error in the giving and refusing of instructions.

IV. Error of the court in entering a judgment, *nunc pro tunc*, correcting the original judgment thereon.

The questions will be taken up in the above order.

I. (a) There was sufficient evidence that plaintiff sustained a loss by hail. He testified that he had 14 acres of cotton on one forty, 38 acres on another and 15 acres on the third. That he was away from home on the 16th of June, the night of the hail storm, having spent that

night with his father-in-law at Holland, Missouri; that he returned about noon on Sunday, June 17, and that he immediately went to his fields to observe the damage, that had been done the night before. On the 14 acres, the leaves had been beaten off, just the stubs of cotton standing and some of them beaten down. That he had been cotton farming for a number of years, that he had had experience with hail storms, having seen cotton crops hit by hail before and that in his opinion, his crop had been hit by a hail storm and was totally destroyed; that the 38 acre patch of cotton was in the same condition with the exception of about 10 or 12 acres which he tried to cultivate but it did not turn out good. That the 15 acres on the last 40 were totally destroyed. He further testified that all his cotton had been planted over 15 days and some about 30 days.

L. C. Credille, who lived about one-half mile from plaintiff, testified that he went over and looked at plaintiff's cotton crop a few days after the hail storm, that part of it was a total loss, some was 50 or 60% destroyed. That on the second 40 where the 38 acres were located, with the exception of 10 to 12 acres that plaintiff afterwards cultivated, it was a total loss, and that the 14 acres were total loss.

Sam Taylor, who lived near plaintiff, recalled a hail storm on June 16, examined plaintiff's cotton crop the next day, testified that practically all of it was a total loss, that here was a small strip on the middle 40 that was about 50% damaged, and that the leaves and limbs were beaten off the stalks of cotton.

J. T. White testified that he lived one quarter of a mile east of plaintiff, that he recalled the hail storm on the night of June 16, 1945, that he was on plaintiff's land shortly after that and that the cotton crop he observed was a "teetotal" loss.

Percy Crawford, a witness for defendant, testified that he was at home in bed the night of the hail storm, that there was just a "turn row" between his and the plaintiff's farm, that he heard the hail while he was in bed but did not get up. The next day he examined his own crop and saw some damage, some leaves on the ground, but not much.

Other witnesses for defendant testified that they examined plaintiff's crop, some on the 3rd of July, some on the 7th and some the following November. Their testimony tended to show no or slight loss by hail. This evidence was all submitted to the jury and the jury found that plaintiff sustained a loss. Under the evidence, they could hardly do otherwise, and their decision, on conflicting evidence, binds this court.

(b) The policy correctly described the Section, Township and Range of the property but on a plat of a section of land printed on the face of the policy, there was inserted an "X" in each of the following 40's: The N. E. ¼ of the N. W. ¼, the S. E. ¼ of the N. W. ¼, the N. E. ¼ of the S. W. ¼ and the S. W. ¼ of the S. W. ¼. The

evidence showed that this was not a correct description of the land upon which the plaintiff's crops were situated, but they were actually located on the N. E. ¼ of the N. E. ¼, S. E. ¼ of the N. E. ¼ and the N. E. ¼ of the S. E. ¼ of Section 27, Township 17, Range 9, but the evidence on the part of plaintiff further showed that the particular location of the land was not given to the agent writing the policy, but was left for him to fill in. He had stated to defendant that he was familiar with the location of the land. After the loss was reported, agents for the defendant went to plaintiff's cotton crop to examine it and ascertain the damage, if any. They had no trouble in locating it.

Mr. Kinsey, a representative of the defendant, testified that he filled in the application for insurance and that it was intended to cover the crop of plaintiff, that he had written insurance on it the year before, that when he went to look at the damaged crop, he went to the right location. That at the time the policy was written all the cotton crop had been planted and some of it was coming through the ground. W. F. Brooks, an adjuster for the company, testified that he went down to look at the cotton crop after the proof of loss had been made and that it was the crop covered by the policy. From this evidence, no one was deceived and if there was a mis-description in the policy, it was clearly the fault of defendant's agent and not of the plaintiff. There is no merit in this contention of defendant.

(c) Defendant also contends that the policy in question provided for an appraisal of the amount of damage, which was a condition precedent to the right to sue. Plaintiff says it provided for an arbitration and, if so, the appointment of arbitrators was not a condition precedent to bringing an action on the policy under the provisions of Section 15233, Revised Statutes of Missouri, 1939. That section follows:

"Any contract or agreement hereafter entered into containing any clause or provision providing for an adjustment by arbitration shall not preclude any party or beneficiary under such contract or agreement from instituting suit or other legal action on such contract at any time, and the compliance with such clause or provision shall not be a condition precedent to the right to bring or recover in such action."

It will be noted that the application for the policy contains the following paragraph:

"In the event of disagreement, in case of loss, as to the amount of loss, such disagreements shall, at the request of either the Company or the insured, be submitted to arbitration as provided in the By-Laws of this Company."

The by-laws of the company, consisting of 16 sections in fine print on the back of the policy, contain the following:

"Sec. 10. Whenever any member shall sustain a loss, he shall, within ten days, proceed to notify the Secretary in person, or by registered letter. This company will not be liable for any loss not reported within ten days of the date of the storm causing such loss. On receipt of such notice, the Secretary shall send a person duly authorized by this company, who shall proceed to adjust the loss, all adjustments to be subject to the approval of the Board of Directors and in case of disagreement either as to whether there is any loss *at all* or as to *the amount of the loss,* it shall be settled by *arbitration* as follows: The company shall choose an *arbitrator* and the assured one, and the two thus chosen shall select a third, and an *award* signed by all the *arbitrators shall be final and binding upon both parties.* The cost of the *arbitration* shall be borne equally by the company and the assured. The loss in no case shall be payable until thirty days after the *award* of the *arbitrators* herein required shall have been rendered." (Emphasis ours.)

It will be noted that the word "appraisers" or "appraisal" is no where used in the application or by-laws. When the representatives of the company went to Dunklin County to carry out these provisions relative to arbitration, they presented to the plaintiff's arbitrator, Mr. Credille, what they termed an "Arbitration Agreement" which stated that defendant had issued the plaintiff an insurance policy covering hail damage to growing crops, that the plaintiff was claiming such damage and that plaintiff and defendant were unable to agree as to the amount of said damage and it was therefore agreed that the controversy be settled by arbitration according to Section 10 of the by-laws. In this arbitration agreement, W. F. Brooks was to represent defendant and L. C. Credille was to represent the plaintiff as arbitrators. This "Arbitration Agreement" further provided:

"It is further agreed, that the said parties hereby appointed as *arbitrators* shall meet and agree upon a third person to act as the third *arbitrator.*

"THEREFORE, it shall be the part of the above *arbitrators,* together with the *arbitrator* chosen by them to ascertain whether the said party of the first part (Defendant) is liable to said party of the second (Plaintiff) *at all and if it is decided that the party of the first part is liable to the said party of the second part,* the said *arbitrators* shall determine what percent of the said crops have been damaged by hail, and upon the finding of this percent, the *award* of the said *arbitrators* shall be given according to the contract issued to the said second party." (Emphasis ours.)

This document contained an oath that "the undersigned arbitrators" will "decide fairly and justly the settlement submitted to us according to the contract of insurance, articles of corporation and by-laws, all of which form the basis of agreement, and to render the decision *in writing* to the best of our judgment and ability."

.: Then follows a blank form of, award in which the arbitrators could find that the defendant "is liable to the said plaintiff," or "is not liable to the said plaintiff" and if found to be liable the amount of such liability. This award was to be made, according to its provisions, by the arbitrators "after carefully considering the evidence." This document further contained what might be termed a fee bill to be signed by the three arbitrators and sworn to by them giving in detail the total expenses of the arbitration and each party's share thereof. Each party appointed an arbitrator and each of these arbitrators signed the blank form of oath attached to the "Arbitration Agreement" and the agreement was signed by plaintiff and defendant. The two arbitrators failed to agree on anything. It will be borne in mind that the application for insurance, the by-laws and the provisions of the policy, as well as the "Arbitration Agreement" are all documents prepared by and in the language of the defendant. As was said in Schmidt v. Utilities Insurance Co., 182 S. W. (2d) 181, 353. Mo. 213:

"We must determine the intention of the parties to the contract from a consideration of the whole document and the terms and provisions thereof. Keeping in mind, however, the established rules for the construction of the insurance contracts, to-wit, that a policy must be liberally construed in favor of the insured so as not to defeat, without a plain necessity, his claim to indemnity, which in making the insurance it was his object to secure; and that, when words are susceptible of two interpretations, that which will sustain insured's claim must be adopted, since the language employed in the policy is that of the insurer (Soukop v. Employers' Liability Assur. Corp., 341 Mo. 614, 108 S. W. (2d) 86, 91, 112 A. L. R. 149), we must hold that the policy in suit does not require that the injury be the direct and proximate result, in any strict legal sense of that term, of the use of the automobile covered by the policy."

The case of Dworkin et al. v. Caledonian Ins. Co., 285 Mo. 359, 226 S. W. 846 clearly distinguishes between an arbitration and an appraisal. Appraisers are restricted solely to finding the amount of damage. Arbitrators endeavor to settle the whole dispute. They pass upon the question whether there is any liability "at all", and if they find there is liability, they then find the amount. Undoubtedly it was the intention of the company to have an arbitration in this case, else, why would they state in their arbitration agreement that the arbitrators were first to determine whether the defendant was liable to the plaintiff "at all", and then, if they decided there was a liability on the part of defendant, they would determine "what percent of said crops have been damaged by hail" and they shall then make their "award." In addition to the foregoing, they took an oath to "decide fairly and justly the settlement submitted" to them and "to render the decision in writing to the best of our judgment and

ability." The proposed form of award states their findings "after carefully considering the evidence." No where is this proposed proceeding referred to as an appraisal. The words arbitration and arbitrators are used throughout. We must assume that defendant in writing the provisions for arbitration knew the meaning of the words used. Whether it was an arbitration agreement was a question of law to be decided by the court. (C. J. S. page 166, Sec. 27.) We hold that the trial court was correct in deciding this was an arbitration agreement and that under provisions of Section 15233 *supra*, a completed arbitration was not a condition precedent to the bringing of a suit by plaintiff. Appellant has cited several cases to support its contention but the facts of those cases are not as in the case before us. In each case so cited "appraisers" were appointed with only one duty, to ascertain the "amount of the loss."

The fact that there was no provision in the "Arbitration Agreement" for the circuit court entering judgment on the award does not make it any the less an arbitration. [Wolfe v. Hyatt, 76 Mo. 156; Thatcher Implement & Merc. Co. v. Brubaker, 193 Mo. App. 627, 187 S. W. 117.]

II. Plaintiff introduced in evidence a plat of Section 26, Township 17, Range 9 of Dunklin County, Missouri. It was drawn by Mr. Bradley, an attorney for plaintiff, who testified that it was a sketch of Sec. 26, Township 17, Range 9, showing the location of the Cotton-Belt Railroad, Cotton Plant to Steele Road and the main drag line ditch, Elk Chute, together with a ditch that runs down the east side of the section with particular reference to the Dr. Spence farm in 1945, and that it gave a fair sketch of Elk Chute drag line ditch. It was identified by plaintiff as a "fair sketch of that vicinity."

It was examined by Percy Crawford, defendant's witness, who identified the drag line ditch, the Cotton Plant-Steele Road, the ditch on the east side of plaintiff's house and the place the witness lived. It was used by defendant's attorney in the examination of their witness, W. E. Rouse, who identified certain places on the exhibit.

On cross examination it was presented to Mr. C. D. Hitt, a witness for defendant, who pointed out the location of plaintiff's cotton crop. The only objection to it is that Mr. Bradley testified that in drawing it, "so far as the location and ditches are concerned, it is located off of government maps." Appellant contends that witness Bradley testified that it was a copy of a government survey and was therefore not admissible because of not being the original and therefore best evidence. The evidence does not bear out this statement. It would make no difference where Mr. Bradley got his information in drawing it, if it were a correct representation of the premises, which the testimony shows it was. [Collins v. Leahy (Mo. App.), 102 S. W. (2d) 801.]

III. The court gave the following instruction No. 4-P:

"The Court instructs the jury that the failure of the arbitrators appointed by plaintiff and defendant to select a third arbitrator and make an award under the agreement signed by plaintiff and defendant, does not, as a matter of law, constitute a defense to this suit."

The giving of this instruction is alleged as error. The court's refusal was based upon the statutory provision (Sec. 15233) and was not error for the reasons heretofore given.

It is next insisted that the court erred in refusing to give defendant's instruction No. 2.

"The Court instructs the jury that if you find and believe from the evidence that plaintiff and defendant disagreed as to the amount of loss by hail to plaintiff's cotton crop and that defendant requested the appointment of appraisers to determine the amount of loss; and if you further find and believe from the evidence that plaintiff refused to agree to the appointment of appraisers to determine the amount of said loss unless defendant agreed to select an appraiser from Dunklin County, Missouri; and if you further find that such action on plaintiff's part, if so, was an unreasonable limitation upon defendant's right to select an appraiser, if you so find, then your verdict shall be for the defendant."

The undisputed evidence showed that each party did appoint an arbitrator and that these arbitrators failed to agree upon either the third arbitrator, the liability of defendant or the amount of damage.

If the agreement between plaintiff and defendant in this case had been merely for the purpose of appraisal of the amount of loss, and there had been evidence that plaintiff refused to agree to the appointment of appraisers, for that purpose, there might be something to appellant's contention but, as heretofore said, it was an agreement for arbitration and not one of mere appraisal. This also answers defendant's contention that the court erred in failing to give instruction No. 3, wherein the defendant asked the court to instruct the jury that if they believed from the evidence that plaintiff refused to agree to the appointment of appraisers, unless the defendant agreed to select an appraiser from Dunklin County, Missouri, then their verdict must be for defendant. This instruction was also based upon the theory that the arbitration agreement was in fact one of appraisement.

IV. Appellant finally contends that the court erred in entering judgment, *nunc pro tunc,* to correct the original judgment. This contention requires an additional statement of facts.

After the jury had deliberated for sometime they returned into court where the following proceedings were had:

"The Court: Gentlemen, have you arrived at a verdict?

"Juror: No, sir. We want some information; in case we find a verdict for the plaintiff at $33.33 per acre on fifty-five acres and fifty

percent on the twleve acres—what is the amount the plaintiff is sueing for?

"The Court: Gentlemen, you have the instructions.

"Juror: I don't understand exactly.

"The Court: They argued it and nothing I can tell you now, I don't think.

"Juror. The two-thirds would be just $33.33?

"The Court: You read the instructions.

(Jury returns to jury room)

(Jury returns to court room)

"The Court: Gentlemen, have you arrived at a verdict?

"Juror: Yes, sir.

"The Court: Pass it to the clerk.

"Clerk: We, the jury, find the issues in said cause for plaintiff and against defendant and assess plaintiff's damages in the sum of $2033.07."

A photostatic copy of the verdict rendered by the jury is in the transcript and is as follows: (Omitting caption.)

"We, the jury, find the issues in said cause for plaintiff and against defendant, and assess plaintiff's damages in the amount of $2.0.3307 Dollars.

(Signed)    CLARK NAVE<br>Foreman."

On July 17, 1946, the court rendered the judgment upon this verdict in the sum of $2.0.3307. Thereafter, on the 24th day of July, 1946, the defendant filed a motion to modify the judgment and prayed the court to change the judgment as follows:

"That said judgment was entered for the sum of Two Thousand Thirty-three and 07/100 ($2,033.07), which said judgment is in excess of the sum of Twenty and $\frac{33.07}{100}$ Dollars ($20.3307), the amount of the verdict returned by the jury.

"WHEREFORE, defendant prays that the court modify said judgment so that the amount thereof will read Twenty and $\frac{33.07}{100}$ Dollars ($20.3307) instead of Two Thousand Thirty-three and 07/100 Dollars ($2,033.07)."

This motion was overruled. A notice of appeal was filed and an appeal taken to this court. On the 8th day of January, 1947, plaintiff filed a motion to correct the judgment asking the court to make the judgment read $2,033.07 instead of $2.0.3307. In support of this motion the minutes of the court made at the time the verdict was rendered were introduced in evidence, and were as follows:

"Jury returns verdict assessing ptff damages in the sum $2033.07."

The clerk's minutes made at the time were introduced in evidence and were as follows:

"We, the jury, find the issues in said cause for plaintiff and against the defendant, and assess plaintiff's damages in the amount of $2033.07. Clark Nave, Foreman."

This entry was made immediately following the return of the verdict into, court. The court sustained the motion and amended its judgment, *nunc pro tunc*, so that it would read in the sum of $2,033.07 instead of as previously recorded, $2.0.3307. It seems to us there can be no question but what it was the intention of the jury to render a verdict for $2,033.07. You need only go to the question of the juror when the jury returned into court shortly before rendering the verdict. He told the court they wanted some information and indicated that they were going to find a verdict for plaintiff at the rate of $33.33 per acre on 55 acres and 50% on 12 acres. They wanted to know the amount the plaintiff was suing for. The court referred them to the instructions he had already given them and sent them back to the jury room after one juror had remarked, "The Two-thirds would be just $33.33." Fifty-five acres at $33.33 and 12 acres of 50% of that would come to exactly $2,033.07. The verdict was read in the presence of the jury. The clerk's minutes show that he understood it was $2,033.07. The court's minutes show that that was its understanding and it was the amount that the jury indicated they were going to return. [Burton v. Burton, 288 Mo. 531, 232 S. W. 476; Jordan v. St. Joseph Ry. Light & Power Co., 335 Mo. 319, 73 S. W. (2d) 205; Hays v. Hogan, 273 Mo. 1, 200 S. W. 286.]

While it would have been better to have noticed the error at the moment and had the jury correct it, we can not say that it was reversible error for the court to correct its judgment, *nunc pro tunc*. Finding no reversible error, the judgment of the trial court should be affirmed. It is so ordered. *Fulbright, P. J.,* and *Blair, J.,* concur.