**William H. ALLISON et al., Plaintiffs-Respondents,**

**v.**

**Ernest W. MOUNTJOY, Defendant-Appellant..**

No. 23957.

Kansas City Court of Appeals.

Missouri.

June 1, 1964.

315

Howard W. Bevins, Kansas City, for appellant.

Harold T. Van Dyke, Billy S. Sparks, Kansas City, Karl V. Shawver, Jr., Paola, for respondents.

HUNTER, Judge.

Plaintiff-respondents, Mr. and Mrs. William H. Allison, brought suit in the Circuit Court of Jackson County on a $10,000 check given by defendant-appellant, Ernest W. Mountjoy, in accordance with a real estate contract for the purchase of plaintiffs' farm and upon which defendant stopped payment allegedly wrongfully.[1] Defendant filed an answer alleging (1) that the check was obtained from him by plaintiffs by means of fraud and deceit, and (2) that there was no consideration for the issuance of the check and it is void. Defendant also filed a counterclaim for $20,000 alleging plaintiffs fraudulently represented the water supply upon the farm "was excellent and supplied the house and barns adjacent thereto and they had not been required to haul water to said farm."

The causes were tried to a jury which, at the close of the evidence on May 2, 1963, was directed in Instruction No. 1 that if defendant as down payment on the real estate contract gave plaintiffs a check for $10,000 and thereafter stopped payment on that check and has not paid it, "then you. will find the issues for plaintiffs William H. Allison and LaVelle B. Allison, unless you believe from the evidence that the check was obtained (by plaintiffs) by means of fraud and deceit. * * * If you find for plaintiffs, William H. Allison and LaVelle B. Allison you will assess their damages .at the sum of Ten Thousand Dollars, with interest thereon at the rate of 6% from the date payment of check was refused."

The jury was also given form of verdict Instruction No. 11 to the effect that if they found for plaintiffs on plaintiffs' petition for the principal amount or the principal amount and interest, and in favor of plaintiffs on defendant's counterclaim their verdict may be in the following form: "We,. the jury, find the issues in favor of the plaintiffs and assess the amount of their recovery at the sum of $———— principal,. and we further assess the amount of interest at the sum of $————, and we find the issues in favor of plaintiffs on defendant's. counterclaim. ——————Foreman."

The jury's verdict returned in open court was: "We, the Jury, find the issues in favor of the plaintiffs and assess the amount of their recovery at the sum of $1.00 (one) Principal, and we further assess the amount of interest at the sum of none and we find the issues in favor of plaintiffs on defendant's counter-claim. Foreman Guy W. Brouse." Judgment was immediately entered accordingly and the jury was discharged. Defendant neither filed a motion for a new trial nor appealed from the adverse judgment on his counterclaim.

On May 11, 1963, plaintiffs filed a motion to set aside judgment entered and to enter proper judgment or to correct jury's verdict, or in the alternative motion for new trial on sole issue of damages, for the stated reason that where there is no controversy as to the amount due under a contract or note, if defendant's defense fails, the court should instruct the jury to find for the total amount due. Further, that the jury had found in favor of plaintiffs and against defendant but erroneously inserted an improper amount in the written verdict; and, that the court should correct the verdict by striking out the words and figure "$1.00 (one)" and insert "ten thousand ($10,000) dollars" and enter judgment on the verdict as corrected, or grant a new trial as to damages only.

On July 17, 1963, the court sustained plaintiffs' motion to set aside judgment entered and to enter proper judgment for $10,000 or to correct jury's verdict, and overruled plaintiffs' motion for a new trial on the sole issue of damages. Defendant

---

1. See, Missouri Building and Loan Ass'n v. National Liberty Ins. Co., 232 Mo.App. 85, 89 S.W.2d 138(2).

appeals from the resultant judgment of $10,000.

Additional facts as developed during the trial are necessary to an understanding of the issue before us on this appeal.

Plaintiffs who had lived on the farm 13 years listed it for sale in early 1961 through Mr. D. A. Glenn, a real estate broker. The farm consisted of 400 acres with 14 ponds, one for each pasture. There were 10 feed lots with 2 stock tanks in each lot. Each stock tank held approximately 600 gallons of water. There were no ponds in the feed lots but only in the pastures. Water was piped from a large spring fed reservoir holding from 2,000 to 3,000 gallons of water to a hydrant behind the barn and run by hose to each of the feed lots. The farm was essentially in grass and used for cattle feeding. Through the years plaintiffs had cattle on the farm in large numbers. Improvements on the farm included 2 large barns, 5 sheds, and a brick residence.

The framework for the controversy began on January 14, 1963, when defendant who was looking for a farm to purchase went to plaintiffs' farm, located near Louisburg in Miami County, Kansas, with his wife and Mr. Glenn to inspect it.

Defendant was a concrete contractor in Kansas City. He had been raised on a cattle farm and was experienced in its operation. His father had been a buyer for twenty-five years in the Kansas City stockyards. Defendant inspected the farm that day. He returned the following Sunday, January 15, and again on January 17th, each time inspecting the farm. After the January 17th inspection he carefully read and understood the contract in question which had been prepared by Mr. Glenn in his presence and then, together with his wife and plaintiffs, signed it.

Plaintiffs then signed a warranty deed and gave it over to Mr. Glenn. Among other things the contract provided that plaintiffs were to convey a 159.90 acre described portion of the farm by warranty deed to defendant and his wife "In consideration of which, Said Parties of the second part covenants and agrees to pay unto the said part——of the first part, for the same, the sum of Seventy Five Thousand and No/100———Dollars, as follows: *$10,000.00 Cash on the signing of this contract receipt whereof is hereby acknowledged,* and same is payable to William H. Allison and LaVelle B. Allison, his wife, and $65,000.00 Cash when Warranty Deed is delivered together with an abstract brought down to date showing a good Title, * * * Possession will be given Second parties on April 1st, 1961. * * * and same is held by D. A. Glenn, Broker, until final payment is made. * * * First parties agree to give Second Parties an option to purchase 240 acres (described in detail) for the sum of $50,000.00 on or before July 1, 1962. * * * That if default be made in fulfilling this agreement, or any part thereof, by or on behalf of said parties of the second part, this agreement shall, at the option of said parties of the first part, be forfeited and determined, and said parties of the second part shall forfeit all payments made by him on the same, *and such payments shall be retained by said parties of the first part in full satisfaction, and in liquidation of all damages by them sustained* * * *." (All italics ours.)

At the time of signing the contract defendant wrote his mentioned check for $10,000 payable to plaintiffs and as they all sat around a table either gave it to plaintiffs or to Mr. Glenn who immediately and in defendant's presence gave it to plaintiffs. Defendant did not protest this, nor did he mention it then or at any other time that evening. Then they all drove to a restaurant in Louisburg and had dinner.

Next door to the restaurant was a filling station that sold water to farmers. As a result of something said that evening by an employee at the filling station to defendant, on his return to Kansas City later that evening defendant telephoned Mr. Glenn and told him to hold up the contract. The

next morning defendant again visited the filling station and talked to its operator, Jay Blair. He then immediately telephoned his bank and stopped payment on the check. Later that day when Mr. Glenn telephoned him, defendant told Glenn, "to never mind going on with the deal, as far as I was concerned the deal was off."

We turn to defendant's own testimony as to why he stopped payment on the check and refused to complete the purchase. He placed it on two grounds: (1) the giving of the check to plaintiffs by Mr. Glenn and (2) misrepresentations about the adequacy of the water supply. After saying he did not think the giving of the check by Mr. Glenn to plaintiffs was handling it in a "businesslike manner" but rather that Glenn should have held the check until the deed was delivered, he further stated, "Q. There was no agreement that he was to hold that check and not cash it until delivery of the deed, was there? A. No, sir, Q. So if you gave the check made out to Mr. and Mrs. Allison, you expected it to be cashed by Mr. and Mrs. Allison, didn't you? A. Eventually, yes, sir. Q. As a matter of fact, the contract itself calls for the payment of $10,000 cash, doesn't it? A. Yes, sir. * * * Q. And you were complying with that when you wrote a check, is that right? A. Yes, sir. Q. So to you that check was the same as cash? A. Yes, sir. Q. And you intended it to be cash, didn't you? A. Yes, sir. * * * Q. You understood that (the contract) meant that the $10,000.00, if you didn't go through with the deal, would be liquidated damages, didn't you? A. Yes, sir."

Defendant's other given reason, that plaintiffs had misrepresented the adequacy of the water supply is difficult to summarize. We set out defendant's own testimony on the subject. On the occasion of defendant's first visit to the farm, "he (Mr. Allison) at that time told me that there was ample water supply for the barn, the house, and for the cattle in the feed lots, and which he showed me the tanks in every feed lot. He had two tanks in each feed lot. And he

also had a bunch of hose which he showed me what he done, he unrolled this hose and taken it to each tank to fill the tanks. * * * I asked Mr. Allison if he had ample water supply at the house and for the barns and for the cattle. He said he did. He said there was only one time that his reservoir went low and went dry is when somebody unbeknown to him or anybody had left the water on and it drained the reservoir that day and he had saw it on and the water went clear down over the hill. When he saw it, of course, he turned it off, but it had drained the reservoir and it recuperated overnight and filled up. Q. The reservoir filled itself naturally overnight? A. Filled up overnight."

On the second visit, "He (Mr. Allison) merely said there was ample water to supply all of the buildings and the cattle and feed lots. Q. * * * Now, did he mention to you at this time how many cattle that he had run on this farm himself? A. Yes, he did, he mentioned it several times * * * from 300 on up to six or seven hundred head, which wasn't there at all times but various times." (Both parties agreed it takes about twenty-two gallons of water per head of cattle per day.)

On defendant's third visit, "It was brought up again at the lot again about the water supply and I at that time asked Mr. Allison again the direct question if he had enough water to supply the house, the barn and the feed lots, and he said that he did have enough water. I asked him if he had ever hauled any water and he said he had never hauled any water at all on this farm. * * * He brought it up again about the one occasion when the well, somebody left the water on and it run the reservoir dry, but it did recuperate overnight. * * * Q. You weren't told that water was hauled to fill that reservoir even on that one occasion? A. No, I was not."

At the trial in support of his claim of fraudulent misrepresentation of the adequacy of the water supply defendant stated that Mr. Allison had never told him he

hauled water from his ponds to fill up tanks in his feed lots or that he had ever hauled water. "He had told me he had never been in need of water on the farm." Defendant admitted in his deposition which had been taken prior to trial, that Allison had told him, " 'Only on one occasion did I ever have to haul any water, and that was when somebody left the faucet on, out at the barn, and it run the water clear down the hill, and emptied the reservoir,' and he hauled water on that one occasion."

Mr. Allison testified he still owned the property; that in 1960 he had around 600 head of cattle on his farm. "I told him there was plenty of water on the place. * * * I told him I had never had to haul but one load of water to the reservoir" and that was when the hydrant was left on. "I have hauled since I have lived there, since '52, I have hauled approximately five or six tanks of water." One such occasion was when the pump was frozen but the reservoir was full. The load of water was not put in the reservoir. The few other occasions were to save time when he was in a hurry. It was much faster to haul water from a pond to the tanks than to use the hose to fill the *tanks* and he was in a hurry to leave to go to town. He has never bought more than 5 tanks of water. He has never hauled any water *from the ponds to the reservoir,* nor had water hauled from any source to the reservoir except the one mentioned occasion of the faucets being left on and then he had only one tank hauled. He has, in cold weather for convenience, "hauled several loads of water from the ponds to the feed lots." He hasn't hauled any water from the ponds in five years. There is plenty of water for the 160 acres sold defendant, in fact, there is "plenty of water for the entire 400 acres." He told defendant there was enough water to fill the tanks from the reservoir.

Witness J. T. Blair, operator of the mentioned filling station was called as a witness by plaintiffs. He stated he had hauled no water to the Allisons since the spring of 1952 except on several occasions when the

pipes were frozen and he would put two loads in a stock tank. He hasn't hauled any water to the Allisons for the past six or seven years—it was back around 1952. "Mr. Mountjoy asked me if I had hauled them water and I told him, yes, we have hauled practically everybody in the community down there."

Apparently pursuant to a court order requested by defendant a test of the water flow rate of the spring feeding the reservoir was made on April 30, 1963 with four persons present. The cement and stone reservoir is approximately 8 feet in diameter and is 15 feet deep. It holds about 2,000 to 3,000 gallons of water. Without detailing what occurred, the best that can be said for this test was that it was inconclusive in so far as showing how much water the spring supplied to the reservoir and this for the reason those making the test pumped only a relatively small amount of water out of the top of the reservoir before testing to see how much the spring replaced in a one-hour period. This test showed that 5/16 of an inch recovery (near the top) took one hour and represented a flow of about 11 gallons. All the witnesses involved in the test agreed that the lower you get the water in the reservoir the less the back (head) pressure on the spring and the faster the water will flow into the reservoir. The testimony was that it is the last 5/16 of an inch from the top that is the slowest to come in and that it will finally get so high it won't flow any more because it is a gravity flow. None knew how fast it would flow if the level had been lowered more. Defendant's witness frankly stated that to get an accurate recovery measurement the only way was to lower the reservoir water "much farther * * * let's say quite a few thousand gallons * * *." Witness Woolman, who admitted the test made would not give any idea of how much water the spring supplied daily or could supply did say that with drought in mind he wouldn't attempt over 50 cattle at a time.

It is defendant's sole contention on this appeal that the trial court lacked "jurisdic-

tion" to sustain plaintiffs' motion and increase (additur) the jury's verdict from $1.00 to $10,000; that the verdict was for nominal damages and this was proper. Defendant wants the verdict and judgment for one dollar reinstated and did not ask and does not now seek a new trial.

■ The source of defendant's contention is S.Ct. Rule 71.06, V.A.M.R. (formerly statute Section 510.270, V.A.M.S.) which provides in part, "When a verdict shall be found for the plaintiff in an action for the recovery of money only, the jury shall also assess the amount of the recovery * * *." In line with the statute is the general rule that in suits for a money judgment it is the province of the jury to determine all *issues,* including those concerning liability and damages. In those situations controlled by the general rule the court is without authority to add to the amount the jury has awarded as damages and thus increase that award. City of St. Louis v. Vasquez, Mo., 341 S.W.2d 839(20); and see, Thorne v. Thorne, Mo., 350 S.W.2d 754; Jaeger v. Agnew, Mo.App., 252 S.W.2d 847; Meffert v. Lawson, 315 Mo. 1091, 287 S.W. 610.

■ However, there are well known exceptions to the general rule. Or more accurately, in those situations where there is no issue concerning the amount of damages for the jury to determine, the trial court in order to correct the verdict may amend the verdict by increasing the amount found by the jury to the correct amount. Thus, it is said that corrections may be made by increasing the jury's verdict by amending it (1) where the error is merely clerical or formal, (2) where the trial court has or could have instructed a verdict for a certain sum, (3) where the determination of the amount is simply a matter of mathematical calculation based on conceded or undisputed facts, (4) where the undisputed evidence shows that the prevailing party is entitled to at least a sum certain. See, 89 C.J.S. Trial § 517(2), page 203; State ex rel. and to Use of Scarborough v. Earley, 240 Mo.App. 868, 219 S.W.2d 879; State

ex rel. Witte Hardware Co. v. McElhinney, 231 Mo.App. 860, 100 S.W.2d 36; Annotation, 56 A.L.R.2d 213.

■ The judge, of course, cannot under the guise of amending the verdict, invade the province of the jury or substitute his verdict for theirs.

In 1936 our Supreme Court, en Banc, in Home Trust Co. v. Josephson, 339 Mo. 170, 95 S.W.2d 1148, 105 A.L.R. 1063, had before it a suit on sixteen promissory notes which specified the amounts to be paid, the rate of interest and the time from which interest runs. The court held that in an action on a written instrument for payment of money, the execution of which is admitted, the trial court may properly direct a verdict for plaintiff where the only defense fails as a matter of law. In referring to Section 973 RSMo 1929 (Now S.Ct. Rule 71.06), the court said, loc. cit. 1155, " * * * we think that section 973, in providing that 'when a verdict shall be found for the plaintiff in an action for the recovery of money only, the jury shall· also assess the amount of the recovery'—the statute means and was intended to apply only where there is *an issue* as to the amount. * * * It has been said, and we think correctly, that, 'A verdict is the decision of a petit jury upon an *issue of fact* submitted to them. (Citations omitted) If there is no *issue of fact* as to the amount there is nothing, in that regard, for the jury to decide."

Sachs Steel & Supply Co. v. St. Louis Auto Parts & S. Co., Mo.App., 322 S.W.2d 183, involved a suit for rents under a lease. The jury returned a verdict for defendant. The St. Louis Court of Appeals held that where the ultimate facts to render judgment for the plaintiff-lessor had been conceded, and the only defenses submitted were without basis and unproved, there was nothing for the jury to pass on and the trial court should have directed a verdict. The trial court having failed to do so, the appellate court reversed and remanded the cause with directions to the trial court to enter judg-

ment for plaintiff in the amount due under the lease.

█ It is the rule that if the trial court could have directed a verdict for the correct amount of damages it may timely correct a verdict containing an erroneous sum for damages by amending the verdict and entering judgment accordingly. And if the trial court fails to so correct the verdict, the appellate court on proper presentation on appeal may do so or may order the trial court to do so. S.Ct. Rule 83.13(c); Howard Nat. Bank & Trust Co. v. Jones, Mo. App., 238 S.W.2d 905(9).

█ As stated in the cases the better practice is for the trial court to have the jury correct its own verdict immediately following the return of the verdict into court. McManus v. Farmers. Mutual Hail Ins. Co. of Mo., 239 Mo.App. 882, 203 S.W. 107, 114.

In McLaurin v. Frisella Moving and Storage Co., Mo.App., 355 S.W.2d 360, in connection with a claim for unpaid wages and penalty the jury verdict and judgment was for $2,809.45, an inadequate amount. The appellate court stated, loc. cit. 364, "The only issue of fact in the case was whether plaintiff was indebted to defendant for the fee paid to the employment agency. That issue was resolved by the jury in favor of plaintiff, and no error appears as to its decision. Defendant admitted that it had not paid plaintiff the wages of $59.45 which were due her at the time she was discharged, and conceded that by the terms of the contract of employment plaintiff's compensation was to be at the rate of $275 per month. To remand the case for a new trial as to the issue of damages would be a futile gesture. The amount of the penalties to which plaintiff is entitled is a mere matter of calculation, which this court can make. Home Trust Co. v. Josephson, supra. In such a situation we may, after reversing the judgment nisi in whole or in part, either enter a new judgment here, or remand the cause with directions to enter

such judgment. Civil Rule 83.13(c), V.A. M.R. Compare Steuernagel v. St. Louis Public Service Co., 361 Mo. 1066, 238 S.W. 2d 426; Central States Life Ins. Co. v. Bloom, 345 Mo. 982, 137 S.W.2d 517." To the same effect see, LeCompte v. Sanders, Mo.App., 229 S.W.2d 298(6); John Deere Company of St. Louis v. Davis, Mo.App., 335 S.W.2d 686; Howard Nat. Bank & Trust Co. v. Jones, supra, affirmed, 243 S. W.2d 305.

In Wheeler v. Cantwell, Mo.App., 140 S.W.2d 744, this court had before it a suit on a promissory note. The jury verdict and judgment were for $258.67. We said, loc. cit. 749, "With these facts established, the question of the amount due was a mere matter of arithmetic. The jury found for plaintiff in the sum of $258.67, when, in fact, there was due to plaintiff, on the date of trial, October 25, 1938, after allowing all credits claimed by him, the sum of $313.-34." * * * "Since, under the facts in this case as it comes to us, the amount which plaintiff is entitled to recover is a mere matter of calculation, it follows that we may calculate the amount due and direct an entry of judgment accordingly.

"The judgment is, therefore, reversed and the cause remanded, with directions to the trial court to enter judgment as of the date of the trial in favor of plaintiff in the sum of $313.34."

In the case before us do the facts come within any of the rules that permit a trial court to increase the verdict? Plaintiffs contend the jury on proper instructions found the liability issue in their favor and the damages were a certain and undisputed $10,000 which Instruction No. 1 directed the jury to award if it found for plaintiffs on the question of liability and against defendant on his defenses. Hence, say plaintiffs, they were entitled to a directed verdict for $10,000 and the trial court properly corrected the verdict and entered judgment in that sum. The defendant asserts he has presented valid defenses of fraud and failure of consideration; that the $10,-

000 down payment is a penalty and that plaintiffs by failing to show their actual damages are precluded from any verdict except for nominal damages.

■■ The entire transaction before us occurred in the State of Kansas and involved the sale of Kansas land. The substantive law of Kansas controls. The Kansas case of Gregory v. Nelson, 147 Kan. 682, 78 P.2d 889, held that a $15,000 down payment upon the purchase of land sold for $80,000 which pursuant to the contract was retained as liquidated damages upon breach, was not excessive so as to constitute a penalty, and that the vendor was entitled to retain it. The language used in that contract is substantially the same as that used in the contract before us. We have concluded that the Gregory case is controlling, and that the $10,000 payment made by the check in question is for liquidated damages and not a penalty and that it is no defense to plaintiffs' suit that plaintiffs did not adduce evidence of actual damages. And see, Annotation, 6 A.L.R.2d 1418.

■ However, we are unable to agree with plaintiffs that the jury *on proper instructions* has passed on the issue of liability by finding that issue for plaintiffs and by finding against defendant on his defenses so as to resolve any issue concerning the liability of defendant. While it is true the jury found those issues for plaintiffs it did so under the guidance of verdict directing Instruction No. 1 which is reversibly erroneous under the plain error rule. S.Ct. Rule 79.04.

Instruction No. 1 directed the jury to find for plaintiffs if it found and believed certain facts "unless you believe from the evidence that the check was obtained by William H. Allison and LaVelle B. Allison by means of fraud and deceit as alleged in the answer of Ernest W. Mountjoy. You are further instructed that the burden of proof is on the defendant Mountjoy *to prove to your reasonable satisfaction by a prepon-*

*derance of the evidence the defense* that the check was obtained by fraud and deceit." (Emphasis ours.)

In Bell v. Pedigo, Mo., 364 S.W.2d 613, 620, our supreme court ruled that "from after the date when this opinion shall have been printed in the Southwestern Reporter advance sheets, burden of proof instructions in civil cases which contain either the phrase indicating that one's burden is to prove his case or defense by the preponderance, that is, the greater weight of the credible evidence 'to the satisfaction of' or 'to the reasonable satisfaction of,' the jury (or any combination of those phrases or words of similar meaning), will be reversibly erroneous." And this for the reason such words "to the reasonable satisfaction of" require a substantially greater burden of proof than the law casts upon such plaintiff or defendant.

Bell v. Pedigo, supra, appeared in the March 19, 1963, advance sheets. The trial of the instant case began on April 30, 1963. Hence, it was reversibly erroneous for the court, at plaintiff's request to have given Instruction No. 1 containing the criticized phrase "to prove to your reasonable satisfaction."

In passing, we note that as to his burden of proof plaintiff in Instruction No. 1 required only that the jury "find and believe" certain facts. Yet in the same instruction but concerning defendant's burden of proof the requirement was twofold; namely, (1) "to your reasonable satisfaction" and (2) by a preponderance of the evidence.

■ If plaintiffs were entitled to an instructed verdict on the whole case—liability as well as damages—it would be immaterial that there was error in the instructions. The trial court or this court could enter the correct judgment in accordance with the right to the directed verdict. We acknowledge there is a question in our minds as to whether under defendant's own testimony and the admitted facts there is any

issue for the jury concerning the liability of the defendant. Certainly there is no issue as to the amount of damages. On the record before us, plaintiffs are entitled to $10,000 or to nothing.

However, plaintiffs did not ask the trial court for a directed verdict at the close of the case. They chose to submit the question of liability to the jury as an issue in Instruction No. 1. And in their briefs in this court they seek to uphold the judgment on the basis that the jury found for them on the liability issue. Plaintiffs have not contended that in any event they are entitled to a directed verdict on the liability issue, and have not briefed the matter for our benefit. Under such circumstances we are reluctant to pass on that question. It may be that on a retrial that the question may arise, and especially if an accurate check of the flow of water in the spring is evidenced.

The judgment as it relates to the counterclaim of defendant was not appealed from and is final.

For the reasons stated, the judgment concerning plaintiffs' claim is reversed and that cause is remanded for a new trial.

All concur.